# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| **VERNON JONES, MARCKINDAL JULES, LYXON CHERY, ALDWIN JUNIOR BRATHWAITE, PATRICK MADUABUCHI NWANKWO, DWEEN ALFAREL BLACKMAN, RICARDO QUINTANILLA-MEJIA, BRIGHT IDADA FALODUN, PHILIP DONGA, GAMDUR NARAIN, ERIC C. COMMISSIONG, MD. ABU MUSA BHUYAN, IBRAHIMA SORY SOW, JUBRIL ADELAKOUN, JUAN CARLOS LAINEZ MEJIA, CROSWELL WILSON, JONATHAN ESPINAL-POLANCO, MARVENS THOMAS, SHANTADEWIE RAHMEE, DANILO CONCEPCION, OSCAR SALCEDO, CURRY WENDELL FORBES, and NECATI HARSIT;** | **Civil Action No. 1:20-0361** |

**Civil Action No. 1:20-0361**

**EMERGENCY PETITION FOR WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2241 AND COMPLAINT FOR INJUNCTIVE RELIEF**

*Oral Argument Requested*

            *Petitioners,*
    v.

**CHAD WOLF,**
        in his official capacity as Acting Secretary, U.S. Department of Homeland Security;

**THOMAS E. FEELEY,**
        in his official capacity as Field Office Director, Buffalo Field Office, U.S. Immigration & Customs Enforcement; and

**JEFFREY SEARLS**
        in his official capacity as Administrator, Buffalo Federal Detention Facility.

        *Respondents.*

## **INTRODUCTION**

The novel coronavirus, COVID-19, has created a pandemic and disrupted daily functioning around the world.  In only a few months, 458,927 people worldwide have been diagnosed with COVID-19 and 20,806 people have died from the virus.  In New York State, the epicenter of the virus in the United States, 30,811 people have been diagnosed with and 285 people have died from COVID-19.  The Centers for Disease Control and Prevention ("CDC") warns that older adults and people of any age who have serious underlying medical conditions may be at a higher risk for more serious complications from COVID-19.  Underlying medical conditions that influence higher risks of severe illness or death from COVID-19 include lung disease, including moderate to severe asthma; heart disease; immunodeficiency, including cancer; diabetes; and severe obesity. Complications, meanwhile, include pneumonia in both lungs, organ failure in several organs, and death.  A viable vaccine for COVID-19 remains up to eighteen months away.

New York has taken drastic measures to combat the virus.  Governor Andrew M. Cuomo directed that all non-essential businesses statewide to close in-office personnel functions; ordered all essential businesses and entities to implement rules that help facilitate social distancing of at least six feet and to reduce staff by 75%; and directed all individuals to practice social distancing of at least six feet from others when out in the public.  New York hospitals are already experiencing critical shortages of supplies and dwindling treatment capacity.  The New York State government has coordinated with the Army Corps of Engineers to set up temporary hospitals at four large-scale event spaces throughout New York, while the federal government has authorized the deployment of a U.S. Navy hospital ship to New York Harbor.

Congregate settings – environments where people live, eat, and sleep in close proximity with one another – produce heightened risks for the spread of COVID-19.  People who are confined

1

in jails and detention facilities cannot achieve the social distancing needed to prevent the spread of COVID-19 because they live in close quarters with one another; share toilets, sinks, and showers; and eat in communal areas. In a letter to Congress, Dr. Scott A. Allen and Dr. Josiah Rich, medical subject matter experts for the Department of Homeland Security's ("DHS") Office of Civil Rights and Civil Liberties, explained that "social distancing is an oxymoron in congregate settings . . . because of the concentration of people in a close area with limited options for creating distance . . . ." An outbreak within an immigration detention facility not only affects those detained inside the facility but also poses an enormous public health risk because detainees who contract COVID-19 with symptoms that require medical intervention will need to be treated at local hospitals, thus increasing the risk of infection to the public at large and overwhelming treatment facilities. Dr. Robert B. Greifinger, an independent consultant on health care within prisons and detained settings, stresses that many detention facilities lack adequate medical care infrastructure to address the spread of infectious disease and treatment of high-risk people in detention. The prevailing opinion among public health experts is that the release of high-risk individuals from detention facilities is a key part of the public risk mitigation strategy.

COVID-19 has prompted the release of a growing number of detainees from a variety of detention facilities. New York City officials have released seventy-eight detainees from the Rikers Island jail complex in Queens, New York. On March 23, 2020, the Ninth Circuit *sua sponte* ordered the release of an individual held at a California immigration detention facility. *See Xochihua-Jaimes v. Barr*, No. 18-71460 (9th Cir. Mar. 23, 2020). The Court cited the "rapidly escalating public health crisis, which public health authorities predict will especially impact immigration detention centers" as the reason for its order. The United Kingdom Home Office, meanwhile, has ordered the release of almost three hundred immigrants from detention centers,

recognizing that the government could not properly protect immigrants in detention from contracting COVID-19.

Petitioners are individuals held in civil immigration detention at the Buffalo Federal Detention Facility ("BFDF" or "Batavia") who face higher risks of serious complications if they contract COVID-19. Petitioners are either over the age of fifty and/or have a serious underlying medical condition, making them more vulnerable to complications arising from COVID-19. The Buffalo Federal Detention Facility is located in Batavia, New York, in Genesee County, where at least one positive diagnosis of COVID-19 has already been made and a state of emergency has been declared. There are also at least two cases confirmed at the Wende Correctional Facility in Alden, New York, through which all transfers of inmates from New York State prison to the Buffalo Federal Detention Facility are processed.

The dangers posed to Petitioners continued detention at Batavia amidst the current COVID-19 outbreak are "so grave that it violates contemporary standards of decency" to expose them to such a risk. *Helling v. McKinney*, 509 U.S. 25, 36 (1993). Moreover, the severity of the outbreak and potential harm to Petitioners dictate that continued civil detention no longer comports with the narrow and nonpunitive circumstances that ordinarily authorize civil detention. *See Zadvydas v. Davis*, 533 U.S. 678, 690 (2001).

## **PARTIES**

1.      Petitioner Vernon Jones is a 39-year-old native and citizen of Jamaica. Mr. Jones has been detained by ICE at Batavia since September 2019 and is diagnosed with epilepsy and suffers from regular seizures. As a consequence of his chronic epilepsy, Mr. Jones is at a high risk of developing serious complications or death if he contracts COVID-19.

2.      Petitioner Marckindal Jules is a 46-year-old native and citizen of Haiti.  Mr. Jules has been detained by ICE at the BFDF since March 2019, is pre-diabetic and tests of his liver function have returned abnormal results.  Mr. Jules also lives with an unspecified mental illness for which he takes medication.  Mr. Jules is critically vulnerable to COVID-19 because of his pre-diabetic condition.

3.      Petitioner Lyxon Chery is a 60-year-old native and citizen of Haiti.  He has been detained by ICE at the BFDF since December 2017.  Mr. Chery has been diagnosed with moderate to severe Post-Traumatic Stress Disorder and Major Depressive Disorder stemming from past trauma he suffered in Haiti.  Mr. Chery also struggles with high blood pressure.  He takes daily medication for both his mental and physical health.  Mr. Chery is critically vulnerable to COVID-19 because of his age and medical conditions.

4.      Petitioner Aldwin Brathwaite is a 58-year-old native and citizen of Trinidad and Tobago.  Mr. Brathwaite has been detained by ICE at the BFDF since January 2019.  Mr. Brathwaite has recently been diagnosed with prostate cancer and was in the process of obtaining a treatment plan.  Mr. Brathwaite is critically vulnerable to COVID-19 because of his age and his significant health issues.

5.      Petitioner Patrick Maduabuchi Nwanwko is a 53-year old native and citizen of Nigeria.  Mr. Nwankwo has been detained by ICE since June 2018.  Mr. Nwankwo is pre-diabetic and takes medication for high blood pressure.  Mr. Nwankwo is critically vulnerable to COVID-19 because of his age and his medical conditions.

6.      Petitioner Dween Afarel Blackman is a 26-year old native of Suriname and citizen of Guyana.  Mr. Blackman has been detained by ICE since December 2019.  Mr. Blackman suffers from asthma, ulcerative colitis, and an undiagnosed gastrointestinal illness, and because of his

respiratory illness and gastrointestinal complications, he has a weakened immune system. Mr. Blackman is critically vulnerable to COVID-19 because of his medical conditions.

7.      Petitioner Ricardo Quintanilla-Mejia is a 42-year old native and citizen of El Salvador. Mr. Quintanilla-Mejia has been detained by ICE since October 2016. Mr. Quintanilla-Mejia is diabetic, and also suffers from post-traumatic stress disorder, chronic pancreatitis, metabolic syndrome, blood abnormalities, chronic abdominal pain an musculoskeletal pain resulting from injuries sustained while in custody. Mr. Quintanilla-Mejia takes medications to treat some of these conditions in addition to medication for insomnia and PTSD. Mr. Quintanilla-Mejia is critically vulnerable to COVID-19 because of his medical conditions.

8.      Petitioner Bright Falodun is a 38-year old native and citizen of Nigeria. Mr. Falodun has been detained by ICE at Batavia since August 2015. Mr. Falodun has a history of schizophrenia, depression, rhabdomyolysis, acute kidney injury/acute tubular necrosis, hyperkalemia, metabolic acidosis, and transaminitis. Because of his medical conditions, Mr. Falodun is at a high risk of developing serious complications or death if he contracts COVID-19.

9.      Petitioner Bright Idada Falodun is a 38-year old native of Nigeria.[1] Mr. Falodun has been detained by ICE at Batavia since August 2015. Mr. Falodun has a history of schizophrenia, depression, rhabdomyolysis, acute kidney injury/acute tubular necrosis, hyperkalemia, metabolic acidosis, and transaminitis. Mr. Falodun is critically vulnerable to COVID-19 because of his medical conditions.

10.     Petitioner Philip Donga is a 31-year old native and citizen of Sudan. Mr. Donga has been detained at Batavia since December 2018. Mr. Donga has a history of traumatic subdural

---

[1] Mr. Falodun has been ordered removed to Nigeria, but is challenging his order of removal before the Second Circuit Court of Appeals, arguing that he is a citizen of the United States. *See Falodun v. Barr*, 17-18-13 (2d Cir.) (pending).

hematoma as well as seizure disorder, vertigo, and dizziness. He has a long history of tobacco use. He was also identified as at increased risk for cardiovascular disease and is monitored for hyperlipidemia. Mr. Donga has a history of surgery related to his traumatic brain injury and separately for gun-shot wounds sustained in his home country. Mr. Donga is critically vulnerable to COVID-19 because of his medical conditions, history of smoking, and heightened risk of cardiovascular disease.

11.     Petitioner Gamdur Narain is a 59-year old native and citizen of India. Mr. Narain has been detained by ICE in excess of two years. Mr. Narain is critically vulnerable to COVID-19 because of his age.

12.     Petitioner Eric C. Commissiong is a 58-year old native and citizen of Trinidad and Tobago. Mr. Commissiong suffers from high blood pressure. Mr. Commissiong is critically vulnerable to COVID-19 because of his age and high blood pressure.

13.     Petitioner Md. Abu Musa Bhuyan is a 56-year old native and citizen of Bangladesh. He suffers from a tumor on his head. Mr. Musa Bhuyan is critically vulnerable to COVID-19 because of his age and medical conditions.

14.     Petitioner Ibrahima Sory Sow is a 53-year old native and citizen of Guinea. Mr. Sow suffers from an immune deficiency that makes him especially vulnerable to COVID-19. Therefore, Mr. Sow is critically vulnerable to COVID-19 because of his age and medical conditions.

15.     Petitioner Jubril Adelakoun is a 43-year old native and citizen of Nigeria. Mr. Adelakoun has been detained by ICE since March 2018. He is pre-diabetic and suffers from hypertension. Mr. Adelakoun is critically vulnerable to COVID-19 because of his medical conditions.

16.     Petitioner Juan Carlos Lainez Mejia is a 38-year-old native and citizen of Honduras. He has been detained by ICE since December 2017, but was recently moved to the Buffalo FDF from Bergen County Detention Center.  Mr. Lainez Mejia is HIV-positive.  As of December 2019, his HIV status was only partially controlled by anti-retroviral medication, leaving his immune system compromised.  Mr. Lainez Mejia is critically vulnerable to COVID-19 because of his medical conditions.

17.     Petitioner Croswell Wilson is a 51-year old native and citizen of Jamaica.  Mr. Wilson has been detained at BFDF since March 2019.  Mr. Wilson has a history of smoking.  Mr. Wilson is critically vulnerable to COVID-19 because of his medical history and history of smoking.

18.     Petitioner Jonathan Espinal-Polanco is a 37-year-old native and citizen of the Domincan Republic. Mr. Espinal-Polanco has been detained by ICE at Batavia since November 2019. Mr. Espinal-Polanco struggles with asthma, schizophrenia, morbid obesity, and hyperlipidemia. As a consequence of his asthma and other conditions, Mr. Espinal-Polanco is critically vulnerable to COVID-19 because of his medical conditions.

19.     Petitioner Marvens Thomas is a 27-year old native and citizen of Haiti. Mr. Thomas has been detained by ICE at Batavia since July 2019.  Mr. Thomas has a history of schizophrenia, high blood pressure, and seizures. Mr. Thomas is critically vulnerable to COVID-19 because of his medical conditions.

20.     Petitioner Shantadewie Rahmee is a 48-year-old native and citizen of Surimame.  Ms. Rahmee has been detained by ICE at Batavia since October 2019.  Ms. Rahmee struggles with asthma and has her whole adult life.  Ms. Rahmee is critically vulnerable to COVID-19 because of her respiratory condition.

7

21.     Petitioner Danilo Concepcion is a 42-year-old native and citizen of the Dominican Republic.  Mr. Concepcion has been detained by ICE at Batavia since approximately April 2019.  Mr. Concepcion is a Type I diabetic.  Mr. Concepcion is critically vulnerable to COVID-19 because of his diabetes.

22.     Petitioner Oscar Salcedo is a 57-year old native and citizen of the Dominican Republic. He has lived in the United States for 52 years since he was 5 years old.  Mr. Salcedo is critically vulnerable to COVID-19 because of his age.

23.     Petitioner Curry Wendell Forbes is a 42-year old native and citizen of Turks and Caicos and has lived in the United States since he was less than a year old.  Mr. Forbes suffers from schizophrenia, diabetes, hypertension, and hypothyroidism.  Mr. Forbes is critically vulnerable to COVID-19 because of his medical conditions.

24.     Petitioner Necati Harsit is a 58-year-old native and citizen of Turkey.  Mr. Harsit has been detained by ICE at Batavia since November 2019.  He struggles with schizophrenia, diabetes, and had a heart attack and an asthma attack in 2016.  Mr. Harsit is critically vulnerable to COVID-19 because of his age and medical conditions.

25.     Respondent Chad Wolf is sued on his official capacity as the Acting Secretary of the Department of Homeland Security, which is the federal agency responsible for all immigration enforcement and, ultimately, Petitioners' continued detention.

26.     Respondent Thomas E. Feeley is sued in his official capacity as the Office Director of the Buffalo Field Office of the U.S. Immigration and Customs Enforcement, Enforcement and Removal Operations, which exercises authority over the Buffalo Federal Detention Facility and controls Petitioners' detention or release from that facility.

27.     Respondent Jeffrey Searls is sued in his official capacity as the Administrator of the Buffalo Federal Detention Facility at which Petitioners are all currently detained.

## JURISIDICTION AND VENUE

28.     This Court has jurisdiction under the United States Constitution.  U.S. Const. art. I § 9, cl. 2 ("The privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require.").

29.     This Court also has subject matter jurisdiction over this matter under 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1346 (original jurisdiction), 28 U.S.C. § 2241 (habeas jurisdiction), and 28 U.S.C. § 1651 (All Writs Act).

30.     Additionally, this Court has jurisdiction to grant injunctive relief in this case pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201.

31.     Venue is proper in the U.S. District Court for the Western District of New York because Petitioners are detained at the Buffalo Federal Detention Facility in Batavia, New York, which is within the Western District of New York.  28 U.S.C. § 1391.

## FACTS

**COVID-19 Poses Grave Risks of Harm, Including Serious Illness or Death, to Older People and Those with Underlying Medical Conditions.**

32.     COVID-19 is a respiratory illness that has reached pandemic status.  As of March 25, 2020, 458,927 people worldwide have been diagnosed with COVID-19 and 20,806 have died from COVID-19 related complications.  Public health experts predict COVID-19 cases to rise exponentially in the coming months and conditions to worsen as healthcare infrastructure and medical resources are strained by growing needs for treatment.

33.     People over the age of fifty and people of any age who are diagnosed with or have a history of certain underlying medical conditions face greater chances of developing serious complication or dying from a COVID-19 infection.  These conditions include: lung disease; heart disease; chronic liver or kidney diseases, including hepatitis and dialysis patients; diabetes; epilepsy; hypertension; compromised immune systems, such as from cancer, HIV, or autoimmune disease; blood disorders, including sickle cell disease; inherited metabolic disorders; stroke; developmental delay; and pregnancy.

34.     In many people, COVID-19 causes fever, cough, and shortness of breath.  For people who develop serious complications, however, COVID-19 can cause: life-threatening pneumonia, marked with a filling of the lungs with inflammatory material; severe damage to the lung tissue; inflammation of the heart muscle, leading to rapid or abnormal heart rhythms; or an overreaction of the autoimmune system, which can cause widespread and permanent damage to the patient's other organs.

35.     Serious complications from COVID-19 can manifest at a rapid pace.  Patients can show the first symptoms of infection in as little as two days after exposure and their condition can rapidly deteriorate in as little as five days or sooner.

36.     The spread of COVID-19 is also occurring at an alarming pace.  The virus can stay on certain surfaces for up to 72 hours and can remain in air particles.  People who have been exposed to the coronavirus may remain asymptomatic for weeks, possibly never showing symptoms, but could still be carriers for the virus.

37.     Even some younger and healthier people who contract COVID-19 may require intensive supportive care, including supplemental oxygen, positive pressure ventilation, and in extreme cases, extracorporeal mechanical oxygenation.  People in higher risk categories who

10

develop serious complications, however, will require advanced support.  This level of supportive care requires highly specialized equipment that is in limited supply and entire teams of care providers, including nurses, respiratory therapists, and intensive care physicians.  The level of support required to adequately treat people with COVID-19 infections can quickly exceed local health care resources.

38.     People in the higher risk populations – such as Petitioners – face a fatality rate of approximately 15 percent from a COVID-19 infection.  Even in high-risk patients who do not die from COVID-19 must expect a prolonged recovery, including the need for extensive rehabilitation for profound reconditioning, neurologic damage, or the loss of respiratory capacity.

39.     Due to the trajectory of COVID-19's spread and the limitations of the existing medical care infrastructure, public health experts have emphasized that social distancing is the only viable option for mitigating the virus's damage in the absence of mass testing.  Even so, projections published by researchers from the Imperial College London show that even with the implementation of stringent mitigation strategies, such as orders for nationwide social distancing, home isolation, and continued school and university closures, the death toll in the United States could still reach as high as 1.1 million people.  And without such actions, the death toll could reach upwards of 2.2 million people.

**New York State is the Most Highly Impacted State in the Country and Has Begun to Take Extraordinary Measures to Curtail the Spread of COVID-19.**

40.     As of March 25, 2020, New York State has reported 30,811 confirmed cases of COVID-19 and 285 deaths, representing the nation's most-impacted state.  New York's hospitals

are beginning to experience critical shortages of supplies and are running low on treatment space. Governor Andrew M. Cuomo announced plans to outfit several large convention sites into makeshift hospitals and the imminent arrival of two U.S. Navy hospital ships into New York Harbor.

41.     The continuing and rapid spread of COVID-19 throughout the state led Governor Cuomo to impose a ten-part plan heavily restricting residents' movements and curtailing social activity.  Measures include the statewide closure of all non-essential businesses, a directive to entities providing essential services to adopt rules that facilitate social distancing of at least six feet and a 75% reduction in in-person staff, and a requirement for all individuals to practice social distancing of at least six feet from others when in public.

42.     The spread of COVID-19 throughout New York has also begun to impact the Rikers Island jail complex in Queens, New York, with confirmed cases rising to thirty-eight as of March 22, 2020 and continuing to rise to 52 confirmed cases at the time of filing.  On March 20, the New York City Department of Correction released fifty-six detainees from Rikers Island due to COVID-19.  On March 22, Mayor de Blasio announced that twenty-three more detainees were set to be released and the city is reviewing two hundred additional inmates for possible release.  Officials' decision to release vulnerable detainees from Rikers Island came at the heels of calls from the N.Y.C. Board of Correction to "immediately remove from jail all people at higher risk of COVID-19 infection" and "rapidly decrease the jail population."

43.     Positive cases of COVID-19 have similarly begun to emerge within the New York State Corrections system.  On March 17, 2020, an employee at the Sing Sing Correctional Facility in Ossining, New York tested positive for COVID-19; while on March 22, 2020, two inmates

tested positive for COVID-19 at the Wende Correctional Facility[2] in Alden, New York.  At least one inmate is confirmed positive for COVID-19 at the Clinton Correctional Facility in Dannemora, New York.  Moreover, news outlets report that as of today, as many as seventeen DOCCS staff at several facilities have tested positive for the virus.

44.    The potential outbreak of COVID-19 within the state's correctional facilities and at ICE facilities in New Jersey (from which Petitioner Juan Carlos Lainez Mejia was recently transferred to the BFDF), as well as the disproportionate impact the virus might have within a prison setting, has prompted State Senator Luis Sepúlveda and Assemblyman David Weprin to issue a joint letter to Governor Cuomo calling for the immediate creation and convening of an emergency COVID-19 release committee.  The two legislators opined that "[a]nyone who can be safely sent out to the community and who has a family or a stable living situation to go to should be immediately considered for release regardless of the length of his or her remaining sentence." *See* Letter from Sen. Luis R. Sepúlveda and Assemblyman David Weprin to Governor Andrew M. Cuomo, dated March 19, 2020 [annexed as Exh. D].

**People Detained at the Buffalo Federal Detention Center in Batavia, New York Face an Elevated Risk of COVID-19 Transmission.**

45.    People who live in "congregate environments" – places where people live, sleep, and eat in close proximity with one another – face particularly acute risks of contracting COVID-19.  Immigration detention facilities have greater risk of infectious spread because of conditions of crowding, the proportion of vulnerable people detained, and often scant medical care resources.

---

[2]    Wende Correctional Facility is the state prison through which all inmates being transferred to ICE custody at Batavia are out-processed from state custody and handed over to ICE.

46.     Absent a vaccine or mass testing, neither of which is presently available, public health officials identify social distancing as the only viable option to mitigate the spread of the virus and reduce the risk of contracting COVID-19.  Social distancing, however, is an oxymoron in congregate settings like the Buffalo Federal Detention Facility because detainees have severely limited options when trying to create distance between each other.  Specifically, detained non-citizens are forced to share toilets, sinks, and showers, often without disinfection between uses. Food preparation and food service is similarly communal with few opportunities for surface disinfection.

47.     In detained settings, the risk is not only limited to occupants of the detention facility, but also the surrounding community because detainees who contract COVID-19 with symptoms that require medical intervention will need to be treated at local hospitals and increase the risk of infection to the public at large.  There is also a risk to security officers who necessarily interact daily with detainees, but who then leave the facility each day to the public.

48.     Public health experts warn that an outbreak at a prison or detention facility could quickly overwhelm the medical resources of the facility's surrounding community.  Local hospitals, which already have limited access to ventilators or other vital equipment, will face extreme difficulty trying to treat multiple COVID-19 patients at a time.  This is particularly true of Batavia, which does not have large-capacity healthcare infrastructure.[3]

49.     Dr. Robert Greifinger, a correctional health expert who has extensive experience working with New York detention facilities, concludes that "even with the best-laid plans to

---

[3]     For example, the hospital in Batavia – United Memorial Medical Center – has a total of 133 beds relative to a town of approximately 14,500 residents, in addition to the approximately 650 detainees at the Buffalo Federal Detention Facility.

address the spread of COVID-19 in detention facilities, the release of high-risk individuals is a key part of a risk mitigation strategy." Drs. Scott A. Allen and Dr. Josiah Rich, medical subject matter experts for the DHS Office of Civil Rights and Civil Liberties, wrote in a letter to Congress that in order "to implement immediate social distancing to reduce the likelihood of exposure to . . . the general public, it is essential to consider releasing all detainees who do not pose an immediate risk to public safety."

50.     Beyond the inherent characteristics of detention facilities that make them highly susceptible to infection outbreaks, the BFDF possesses several additional dangers of a COVID-19 outbreak. The facility has not been fully closed to the public, as it houses the Batavia Immigration Court, which continues to operate on a regular basis. Immigration judges, court personnel, facility personnel, attorneys, noncitizens' family members[4], and others continue to enter and exit BFDF daily.

51.     The BFDF also continues to receive incoming detainees from the New York State Department of Corrections and Community Supervision ("DOCCS") and other detention facilities. The Wende Correctional Facility in Alden, New York serves as the regular transfer facility for a person leaving DOCCS custody and into ICE custody. The facility reported two confirmed COVID-19 cases among the inmate population on March 22, 2020.

**Petitioners are Vulnerable to Serious Complications if Infected by COVID-19**

52.     Petitioners in this case comprise people who are particularly vulnerable of developing serious complications from a COVID-19 infection because of their age or underlying medical conditions. Collectively, in addition to several at risk due to their age, Petitioners suffer

---

[4]     Routine family visitation has been suspended, but family members may testify in person in the Batavia Immigration Court.

from a broad range of serious medical conditions that make them susceptible to both serious complications or death if any one of them were to contract COVID-19.

53.     For example, Petitioner Vernon Jones suffers from epilepsy and Petitioners Marvens Thomas and Philip Donga suffer from seizures.  The Epilepsy Foundation reports that "people with epilepsy and other medical conditions may be at greater risk of developing more severe illness if they are exposed to COVID-19" and the American Epilepsy Society reports that "viral illnesses [such as COVID-19] may be a trigger for seizures."

54.     Petitioners Dween Blackman, Jonathan Espinal-Planco, and Shantadewie Rahmee have asthma and Petitioners Croswell Wilson and Philip Donga have a history of smoking.  The CDC reports that "People with asthma may be at higher risk of getting very sick from COVID-19 [because] COVID-19 can affect [the] respiratory tract (nose, throat, lungs), cause an asthma attack, and possibly lead to pneumonia and acute respiratory disease."  The American Lung Association reports that those with chronic lung disease or other respiratory conditions "are more likely to develop severe symptoms."  The CDC reports that those with any history of heart-related or respiratory illness, including asthma or a history of smoking, are at a heightened risk from COVID-19.  Petitioners all fall into one or several of these high risk categories.

55.     Petitioners Marckindal Jules, Patrick Nwankwo, Ricardo Quintanilla-Mejia, Bright Falodun, Jubril Adelakoun, Danilo Concepcion, Curry Wendell Forbes, and Necati Harsit suffer from diabetes, prediabetes, or other renal complications.  The National Kidney Foundation reports that "[o]lder adults and people with kidney disease or other severe chronic medical conditions seem to be at higher risk for more serious Coronavirus illness."[5]

---

[5]     NATIONAL KIDNEY FOUNDATION, *Be Prepared: Kidney Patient Prep for Coronavirus* (accessed March 19, 2020), https://www.kidney.org/contents/be-prepared-kidney-patient-prep-coronavirus.

16

56.     Petitioner Juan Carlos Lainez Mejia is HIV-positive and Ibrahima Sory Sow suffers from an immune deficiency.  While the CDC reports that it is so far unknown whether people with HIV are at greater risk from COVID-19, the CDC does report that "[p]eople with HIV can also be at increased risk of getting very sick with COVID-19 based on their age and other medical conditions."  Mr. Lainez Mejia and Ms. Sow both have diminished immune systems and are make them particularly vulnerable to COVID-19.

57.     Petitioners Lyxon Chery, Eric Commissiong, and Marvens Thomas, suffer from high blood pressure.  Petitioners Aldwin Brathwaite and Md. Abu Musa Bhuyan have cancer.  The American Heart Association reports that "older adults with heart disease appear to be at a higher risk of getting COVID-19" and "people of any age with serious underlying medical conditions – such as diabetes, cancer, or kidney failure – may face a higher risk of complications if they do get infected."

## LEGAL FRAMEWORK

### A.     Petitioners Have a Constitutional Right to Reasonable Safety in Custody.

58.     Whenever the government detains or incarcerates someone, it has an affirmative duty to provide conditions of reasonable health or safety.  In *DeShaney v. Winnebago County Dept. of Soc. Servs.*, the Supreme Court explained that "when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being."  489 U.S. 189, 199-200 (1989).  When the government fails to provide the detained individual with his basic human needs, such as "food, clothing, shelter, and medical care . . . it transgresses the substantive limits on state action set by the Eighth Amendment."  *Id*.

59.     Conditions that pose an unreasonable risk of future harm violate the Eighth Amendment's prohibition against cruel and unusual punishment even if that harm has not yet come to pass.  The Eighth Amendment requires that "inmates be furnished with the basic human needs, one of which is 'reasonable safety.'"  *Helling*, 509 U.S. at 33.  Exposure to "toxic or similar substances" constitutes one such circumstance where "the Amendment's protection would be available even if the effects of exposure might not be manifested for some time."  *Id*. at 34.

60.     Furthermore, an injunction may be appropriate even in the absence of a COVID-19 outbreak at Batavia.  *Id*. at 33 ("It would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition . . . on the ground that nothing yet has happened to them.").  Medical experts are reasonably certain an outbreak is likely imminent, and Petitioners need not wait until they have the virus to bring this action.

61.     These principles requiring the government to assure detainees' reasonable safety applies equally – if not under an even heightened standard – in the context of immigration detention.  Immigrant detainees, even those with prior criminal convictions, are *civil* detainees held pursuant to civil immigration laws.  *Zadvydas*, 533 U.S. at 690.

62.     Because detained immigrants are civil detainees, their constitutional protections while in custody are derived from the Due Process Clause of the Fifth Amendment, which afford protections even greater than the Eighth Amendment.  The Eighth Amendment, which applies to persons convicted of criminal offenses, allows punishment as long as it is not cruel and unusual. The Fifth Amendment, by contrast, does not permit punishment at all.  *See Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017) (stating that civil detainees "may not be punished in any manner – neither cruel and unusually nor otherwise.") (internal quotation marks and citations omitted).

18

63.     In *Charles v. Orange County*, the Second Circuit affirmed that individuals in civil detention are "afforded a right to be free from deliberate indifference to their serious medical needs." 925 F.3d 73, 85 (2d Cir. 2019).  Deliberate indifference "can be shown by something akin to recklessness, and does not require proof of a malicious or callous state of mind." *Id*. at 86.  It is established either when "the defendants knew that failing to provide . . . medical treatment would pose a substantial risk to [the detainee]. . . or that the defendants should have known that failing to provide the omitted medical treatment would pose a substantial risk to the detainee's health." *Id*. at 87.

**B.      COVID-19's Threat Imposes a Potential Harm to Petitioners that Exceeds Respondents' interests in Detaining Them.**

64.     The risk of serious illness or death confronting Petitioners should they contract COVID-19 significantly exceeds Respondents' interests in to continue detaining them.   In *Zadvydas*, the Supreme Court emphasized that the government's two interests in detaining noncitizens within immigration detention facilities are to "ensure[] the appearance of aliens at future immigration proceedings" and "prevent[] danger to the community."  533 U.S. at 690 (internal quotation marks and citation omitted).  The government's twin interests must always be weighed against an individual's compelling liberty interest to be free of physical restraint.  *Id*.

65.     The *Zadvydas* Court clarified that the distinction is not between imprisonment and noncitizens "living at large" but rather between imprisonment and "supervision under release conditions . . . ."  *Id*.  at 696.  The Court concluded that "an alien's liberty interest is, at the least, strong enough to raise a serious question as to whether . . . the Constitution permits detention that is indefinite and potentially permanent."  *Id*.  If the government's interest in effectuating removal

and protecting the community cannot justify indefinite detention, it also cannot justify the similarly medical harm that Petitioners are likely to suffer.

66.     This is not the first instance in which this Court has been tasked with considering a habeas action from a Batavia detainee based at least in part on the health consequences in detention.  In *D'Alessandro v. Mukasey*, this Court considered the case of a fifty-year-old petitioner suffering from a "constellation of serious, debilitating, and progressive health problems" that were not likely to improve within ICE custody.  628 F.Supp.2d 368 (W.D.N.Y. 2009).  The Court concluded that petitioner's health problems weighed in his favor in establishing that he was "not likely to violate [any] conditions of release" imposed upon him and subsequently ordered his release.  *Id.* at 400.

**C.     ICE Has the Authority to Release Detained People in Its Custody.**

67.     It is well within ICE's authority to comply with these constitutional requirements by releasing detainees like Petitioners who are especially vulnerable to severe illness or death if they contract COVID-19.  Regulations governing ICE's release authority state that serious medical conditions are one reason to parole an individual, as "continued detention would not be appropriate" in such cases.  8 C.F.R. § 212.5(b)(1).

68.     Respondents have routinely exercised their discretion to release particularly vulnerable detainees from the BFDF based on serious medical conditions.  They also regularly exercise their humanitarian parole authority on behalf of detainees for medical reasons.

69.     ICE officers may exercise favorable discretion in cases involving severe medical concerns and limit the detention of noncitizens with special vulnerabilities.  This group includes individuals who are known to be suffering from serious physical or mental illness, who have

disabilities, who are elderly, pregnant, or nursing, or whose detention as otherwise not in the public interest.

70.     Importantly, these release policies apply regardless of the statutory authorization for an individual non-citizen's detention.  Even individuals mandatorily detained pursuant to 8 U.S.C. § 1226(c) are eligible for release by ICE when risks associated with medical conditions is sufficiently severe.  Release is warranted particularly where the nature of the illness – or potential illness – could impose substantial health care costs on the detention facility, or where the humanitarian equities that mitigate against detention are particularly compelling.

**D.     This Court Has Authority to Order Petitioners Released to Vindicate Their Fifth Amendment Rights, and Such Relief is Appropriate Here.**

71.     "Federal courts have broad discretion in fashioning equitable remedies for . . . constitutional violations." *Ass'n of Surrogates & Supreme Court Reporters Within City of New York v. State of N.Y.*, 966 F.2d 75, 79 (2d Cir. 1992), *opinion modified on reh'g*, 969 F.2d 1416 (2d Cir. 1992).  The Supreme Court has even held that "[w]hen necessary to ensure compliance with a constitutional mandate, courts may enter orders placing limits on a prison's population." *Brown v. Plata*, 563 U.S. 493, 511 (2011).

72.     In cases involving prisons and jails, federal courts have repeatedly ordered the release of detained persons when necessary to remedy constitutional violations caused by overcrowding.  *See, e.g.*, *Duran v. Elrod*, 713 F.2d 292, 297-98 (7th Cir. 1983), *cert. denied*, 465 U.S. 1108 (1984) (concluding that court did not exceed its authority in directing release of low-bond pretrial detainees as necessary to reach a population cap); *Mobile Cty. Jail Inmates v. Purvis*, 581 F. Supp. 222, 224-25 (S.D. Ala. 1984) (concluding that district court properly exercised remedial powers to order a prison's population reduced to alleviate unconstitutional conditions);

21

*Brenneman v. Madigan*, 343 F. Supp. 128, 139 (N.D. Cal. 1972) ("If the state cannot obtain the resources to detain persons . . . in accordance with minimum constitutional standards, then the state simply will not be permitted to detain such persons."). Such examples are in the context of criminal incarceration; as noted above, civil immigration detention is subject to even more liberal protections under the Fifth Amendment.

73.     In ICE's directive on COVID-19, the agency acknowledges that it "only has the authority to detain individuals for immigration purposes . . . [and] cannot hold any detainee ordered released by a judge." Thus, Respondents themselves must acknowledge this Court's authority to order Petitioners released.

74.     As the constitutional principles and public health experts make clear, releasing Petitioners is the only viable remedy to ensure both their safety and the safety of the public-at-large. Petitioners are all older adults and /or persons with pre-existing medical conditions that magnify their particularly grave risk of developing serious complications or death if they contract COVID-19.

## CLAIM FOR RELIEF

### COUNT ONE:

**PETITIONERS' DETENTION IN THE FACE OF COVID-19 VIOLATES THEIR FIFTH AMENDMENT RIGHT TO SUBSTANTIVE DUE PROCESS**
**(Unlawful Punishment; Freedom from Cruel Treatment and Conditions of Confinement)**

75.     The Fifth Amendment of the Constitution guarantees that civil detainees, including all noncitizen detainees, may not be subjected to punishment of any kind. The federal government violates this substantive due process right when it subjects civil detainees to cruel treatment or

when it imposes conditions of confinement that amount to punishment because it does not ensure detainees' safety and health.

76.     The conditions maintained at the Buffalo Federal Detention Facility subject Petitioners to a heightened risk of contracting COVID-19, a deadly virus for which there is no vaccine or treatment, and which is likely to so overwhelm all regional healthcare facilities.  These circumstances, in addition to their individual circumstances, make Petitioners particularly vulnerable, at risk of serious illness and death if any one of them are infected with COVID-19.

77.     As public health experts in correctional medical care and infectious diseases agree, Petitioners, purely by virtue of their detention at the Buffalo Federal Detention Facility, "are at grave risk of severe illness and death."  Thus, Petitioners continued detention, tantamount to material punishment, and no action short of release from detention could cure the violation of their right to reasonable safety under the Fifth Amendment.

78.     As a result of this ongoing violation, Petitioners suffer prejudice, actual and substantial hardship, and irreparable injury.

79.     Petitioners have no adequate remedy at law.


## PRAYER FOR RELIEF

WHEREFORE Petitioners request that the Court grants the following relief:

i.    Assume jurisdiction over this matter;

ii.   Issue an unconditional writ of habeas corpus ordering that Respondents must immediately release Petitioners under appropriate precautionary public health measures and conditions of supervision;

iii.    Issue an injunction ordering Respondents to immediately release Petitioners under appropriate precautionary public health measures and conditions of supervision;

iv.    Order that Petitioners' continued detention at the Buffalo Federal Detention Facility violates the Due Process Clause of the Fifth Amendment;

v.    Award Petitioners their costs and reasonable attorneys' fees in this action as provided for by the Equal Access to Justice Act, 28 U.S.C. § 2412; and

vi.    Grant any order and further relief that this Court deems just and proper.

Respectfully submitted,

/s/ Joseph Moravec
JOSEPH MORAVEC, Esq.
Prisoners' Legal Services of New York
41 State Street, Suite M112
Albany, NY 10027
(518) 694-8699
jmoravec@plsny.org

JOHN PENG, Esq.*
Prisoners' Legal Services of New York
41 State Street, Suite M112
Albany, NY 10027
(518) 694-8699
jpeng@plsny.org

* Admission application submitted; petition for admission scheduled for 04/06/2020

/s/ Nicholas J. Phillips
NICHOLAS J. PHILLIPS, Esq.
Prisoners' Legal Services of New York
14 Lafayette Square, Suite 510
Buffalo, NY 14203
(716) 844-8266
Email: nphillips@plsny.org

/s/ Robert F. Graziano

ROBERT F. GRAZIANO, Esq.
Law Office of Robert F. Graziano, Esq.
50 Fountain Place, Suite 1455
Buffalo, NY 14202
(716) 961-3262
bob@bobgraziano.com

/s/ Grace Zaiman

GRACE ZAIMAN, Esq.
Journey's End Refugee Services
Satellite Office at Catholic Family Center
87 N. Clinton Ave.
Rochester, NY 14604
(716) 480-7889
gzaiman@jersbuffalo.org

/s/ Siana McLean

SIANA MCLEAN, Esq.
Of Counsel to Muscato & Shatkin, LLP
1520 Pine Avenue
Niagara Falls, NY 14301
(716) 842-0550
sianajmlaw@gmail.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on <u>March 25, 2020,</u> I filed this Emergency Petition for a Writ of Habeas Corpus with all supporting papers to the Clerk of the U.S. District Court for the Western District of New York using its CM/ECF system.  The Clerk of the Court electronically served the CM/ECF participants on this case:

- Chad Wolf, Acting Secretary of the U.S. Department of Homeland Security;

- Thomas E. Feeley, Field Office Director, Buffalo Field Office Enforcement and Removal Operations, U.S. Immigration and Customs Enforcement; and

- Jeffrey Searls, Acting Assistant Field Office Director and Administrator, Buffalo Federal Detention Facility

And, I hereby certify that I have sent copies of this filing by electronic mail to the following participants on this case:

- Daniel Moar, Assistant United States Attorney

- Adam Khalil, Assistant United States Attorney

- David Coriell, Assistant United States Attorney

Respectfully submitted,

/s/ Joseph Moravec
JOSEPH MORAVEC, Esq.
Prisoners' Legal Services of New York
41 State Street, Suite M112
Albany, NY 10027
(518) 694-8699
jmoravec@plsny.org
*Attorney for Petitioners*

DATED: March 25, 2020

JS 44 (Rev. 08/18)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Vernon Jones et al. See attached. | Chad Wolf, Thomas E. Feeley, and Jeffrey Searls, all in their official capacities |
| **(b)** County of Residence of First Listed Plaintiff _____ <br> *(EXCEPT IN U.S. PLAINTIFF CASES)* | County of Residence of First Listed Defendant _____ <br> *(IN U.S. PLAINTIFF CASES ONLY)* <br> NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF <br> THE TRACT OF LAND INVOLVED. |
| **(c)** Attorneys *(Firm Name, Address, and Telephone Number)* <br> Joseph Moravec, Prisoners Legal Services of New York, 41 State Street, Ste M112, Albany, NY 12207 (518) 694-8699; see attached for others. | Attorneys *(If Known)* <br> United States Attorney for the Western District of New York |

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1 U.S. Government <br> Plaintiff
- ☐ 3 Federal Question <br> *(U.S. Government Not a Party)*
- ☒ 2 U.S. Government <br> Defendant
- ☐ 4 Diversity <br> *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place <br> of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place <br> of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a <br> Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance <br> ☐ 120 Marine <br> ☐ 130 Miller Act <br> ☐ 140 Negotiable Instrument <br> ☐ 150 Recovery of Overpayment <br> & Enforcement of Judgment <br> ☐ 151 Medicare Act <br> ☐ 152 Recovery of Defaulted <br> Student Loans <br> (Excludes Veterans) <br> ☐ 153 Recovery of Overpayment <br> of Veteran's Benefits <br> ☐ 160 Stockholders' Suits <br> ☐ 190 Other Contract <br> ☐ 195 Contract Product Liability <br> ☐ 196 Franchise | **PERSONAL INJURY** <br> ☐ 310 Airplane <br> ☐ 315 Airplane Product <br> Liability <br> ☐ 320 Assault, Libel & <br> Slander <br> ☐ 330 Federal Employers' <br> Liability <br> ☐ 340 Marine <br> ☐ 345 Marine Product <br> Liability <br> ☐ 350 Motor Vehicle <br> ☐ 355 Motor Vehicle <br> Product Liability <br> ☐ 360 Other Personal <br> Injury <br> ☐ 362 Personal Injury - <br> Medical Malpractice | **PERSONAL INJURY** <br> ☐ 365 Personal Injury - <br> Product Liability <br> ☐ 367 Health Care/ <br> Pharmaceutical <br> Personal Injury <br> Product Liability <br> ☐ 368 Asbestos Personal <br> Injury Product <br> Liability <br> **PERSONAL PROPERTY** <br> ☐ 370 Other Fraud <br> ☐ 371 Truth in Lending <br> ☐ 380 Other Personal <br> Property Damage <br> ☐ 385 Property Damage <br> Product Liability | ☐ 625 Drug Related Seizure <br> of Property 21 USC 881 <br> ☐ 690 Other | ☐ 422 Appeal 28 USC 158 <br> ☐ 423 Withdrawal <br> 28 USC 157 <br> **PROPERTY RIGHTS** <br> ☐ 820 Copyrights <br> ☐ 830 Patent <br> ☐ 835 Patent - Abbreviated <br> New Drug Application <br> ☐ 840 Trademark | ☐ 375 False Claims Act <br> ☐ 376 Qui Tam (31 USC <br> 3729(a)) <br> ☐ 400 State Reapportionment <br> ☐ 410 Antitrust <br> ☐ 430 Banks and Banking <br> ☐ 450 Commerce <br> ☐ 460 Deportation <br> ☐ 470 Racketeer Influenced and <br> Corrupt Organizations <br> ☐ 480 Consumer Credit <br> ☐ 485 Telephone Consumer <br> Protection Act <br> ☐ 490 Cable/Sat TV |
| **REAL PROPERTY** <br> ☐ 210 Land Condemnation <br> ☐ 220 Foreclosure <br> ☐ 230 Rent Lease & Ejectment <br> ☐ 240 Torts to Land <br> ☐ 245 Tort Product Liability <br> ☐ 290 All Other Real Property | **LABOR** <br> ☐ 710 Fair Labor Standards <br> Act <br> ☐ 720 Labor/Management <br> Relations <br> ☐ 740 Railway Labor Act <br> ☐ 751 Family and Medical <br> Leave Act <br> ☐ 790 Other Labor Litigation <br> ☐ 791 Employee Retirement <br> Income Security Act | | | **SOCIAL SECURITY** <br> ☐ 861 HIA (1395ff) <br> ☐ 862 Black Lung (923) <br> ☐ 863 DIWC/DIWW (405(g)) <br> ☐ 864 SSID Title XVI <br> ☐ 865 RSI (405(g)) <br> **FEDERAL TAX SUITS** <br> ☐ 870 Taxes (U.S. Plaintiff <br> or Defendant) <br> ☐ 871 IRS—Third Party <br> 26 USC 7609 | ☐ 850 Securities/Commodities/ <br> Exchange <br> ☐ 890 Other Statutory Actions <br> ☐ 891 Agricultural Acts <br> ☐ 893 Environmental Matters <br> ☐ 895 Freedom of Information <br> Act <br> ☐ 896 Arbitration <br> ☐ 899 Administrative Procedure <br> Act/Review or Appeal of <br> Agency Decision <br> ☐ 950 Constitutionality of <br> State Statutes |

**CIVIL RIGHTS**
- ☐ 440 Other Civil Rights
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 445 Amer. w/Disabilities - Employment
- ☐ 446 Amer. w/Disabilities - Other
- ☐ 448 Education

**PRISONER PETITIONS**
**Habeas Corpus:**
- ☒ 463 Alien Detainee
- ☐ 510 Motions to Vacate Sentence
- ☐ 530 General
- ☐ 535 Death Penalty
**Other:**
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition
- ☐ 560 Civil Detainee - Conditions of Confinement

**IMMIGRATION**
- ☐ 462 Naturalization Application
- ☐ 465 Other Immigration Actions

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original <br> Proceeding
- ☐ 2 Removed from <br> State Court
- ☐ 3 Remanded from <br> Appellate Court
- ☐ 4 Reinstated or <br> Reopened
- ☐ 5 Transferred from <br> Another District <br> *(specify)*
- ☐ 6 Multidistrict <br> Litigation - <br> Transfer
- ☐ 8 Multidistrict <br> Litigation - <br> Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. 2241
Brief description of cause:
Petitioners continued detention in face of COVID-19 pandemic violates 5th Amendment right to reasonable safety

## VII. REQUESTED IN COMPLAINT:

- ☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____ DOCKET NUMBER _____

| DATE | SIGNATURE OF ATTORNEY OF RECORD |
|---|---|
| 03/25/2020 | /s/ Joseph Moravec |

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

**PETITIONERS**

Vernon Jones

Marckindal Jules

Lyxon Chery

Aldwin Junior Brathwaite

Patrick Maduabuchi Nwankwo

Dween Alfarel Blackman

Ricardo Quintanilla-Mejia

Bright Idada Falodun

Philip Donga

Gamdur Narain

Eric C. Commissiong

Md. Abu Musa Bhuyan

Ibrahima Sory Sow

Jubril Adelakoun

Juan Carlos Lainez Mejia

Croswell Wilson

Jonathan Espinal-Polanco

Marvens Thomas

Shantadewie Rahmee

Danilo Concepcion

Oscar Salcedo

Curry Wendell Forbes

Necati Harsit

**Attorneys of Record:**

JOSEPH MORAVEC, Esq.
Prisoners' Legal Services of New York
41 State Street, Suite M112
Albany, NY 10027
(518) 694-8699
jmoravec@plsny.org

JOHN PENG, Esq.*
Prisoners' Legal Services of New York
41 State Street, Suite M112
Albany, NY 10027
(518) 694-8699
jpeng@plsny.org

* Admission application submitted; petition for admission scheduled for 04/06/2020

NICHOLAS J. PHILLIPS, Esq.
Prisoners' Legal Services of New York
14 Lafayette Square, Suite 510
Buffalo, NY 14203
(716) 844-8266
Email: nphillips@plsny.org

ROBERT F. GRAZIANO, Esq.
Law Office of Robert F. Graziano, Esq.
50 Fountain Place, Suite 1455
Buffalo, NY 14202
(716) 961-3262
bob@bobgraziano.com

GRACE ZAIMAN, Esq.
Journey's End Refugee Services
Satellite Office at Catholic Family Center
87 N. Clinton Ave.
Rochester, NY 14604
(716) 480-7889
gzaiman@jersbuffalo.org

SIANA MCLEAN, Esq.
Of Counsel to Muscato & Shatkin, LLP
1520 Pine Avenue
Niagara Falls, NY 14301
(716) 842-0550
sianajmlaw@gmail.com