UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

VERNON JONES, et al.,

         Petitioners,

     v.

CHAD WOLF, et al,

         Respondents.

_____

         20-CV-361
         DECISION & ORDER

On March 25, 2020, the petitioners, civil immigration detainees held in the custody of the Department of Homeland Security, Immigration and Customs Enforcement ("ICE") at the Buffalo Federal Detention Facility in Batavia, New York ("BFDF"), filed an "Emergency Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2241 and Complaint for Injunctive Relief."  Docket Item 1.  The following day, the petitioners filed a motion for a temporary restraining order ("TRO").  *See* Docket Item 8. The petitioners allege that their continued civil detention in the wake of the COVID-19 pandemic violates their substantive rights under the Due Process Clause of the Fifth Amendment to the United States Constitution, and they seek their immediate release from ICE custody.  Docket Item 1 at 23-24.  Each petitioner is "either over the age of fifty and/or [has] a serious underlying medical condition, making [him] more vulnerable to complications arising from COVID-19."  *Id.* at 4.  On March 31, 2020, this Court held oral argument on the TRO.  *See* Docket Item 43.

For the reasons that follow, the Court GRANTS IN PART and DENIES IN PART the petitioners' motion for a TRO.  More specifically, the Court finds that holding the petitioners in the current conditions at the BFDF during the COVID-19 epidemic violates

their substantive Due Process rights.  Immediate release, however, is not the appropriate remedy—at least at this juncture.  The Due Process violation stems from failing to take the steps recommended by public health officials to protect high-risk individuals from contracting COVID-19.  Thus, as explained in more detail below, **the respondents shall submit a detailed plan to the Court by 5:00 p.m. on April 3, 2020**, demonstrating how they will provide those petitioners who are vulnerable individuals, as defined by the Centers for Disease Control and Prevention ("CDC"), with a living situation that facilitates "social distancing."  No later than **9:00 a.m. on April 6, 2020, the respondents shall report to the Court** as to whether any or all of the steps outlined in the plan have been taken and, if so, which ones.  They also shall identify for which petitioners the measures have been taken and provide a brief explanation why any petitioner does not meet the CDC's high-risk criteria.

## BACKGROUND

The petitioners are twenty-two[1] civil immigration detainees,[2] currently held in the custody of ICE at the BFDF.  Docket Item 1.  Each petitioner is "either over the age of fifty and/or [has] a serious underlying medical condition, making [him] more vulnerable to complications arising from COVID-19," a novel coronavirus that has created a global pandemic.  *Id.* at 4.  In less than four months, 951,901 people have been diagnosed

---

[1] Petitioner Shantadewie Rahmee was released on March 30, 2020.  *See* Docket Item 42-5 at 1 n.1.

[2] An exhaustive review of the law governing immigration detention is not possible—or necessary—here.  It is sufficient, for purposes of this motion, to state that immigration detention is a form of civil detention.  *See Zadvydas v. Davis*, 533 U.S. 678, 690 (2001).

with the disease.  *See Coronavirus Resource Center*, Johns Hopkins Univ. & Med. (Apr. 2, 2020, 6:31 AM), https://coronavirus.jhu.edu/.  48,283 have died.  *Id.*

Most of the petitioners allege that they suffer from one or more of the following "medical conditions that influence higher risks of severe illness or death from COVID-19": "lung disease, including moderate to severe asthma; heart disease; immunodeficiency, including cancer; diabetes; and severe obesity."  Docket Item 1 at 2.  The petitioners' medical expert, Joe Goldenson, M.D., classifies such petitioners as being "at grave risk of developing serious complications or dying if [they] contract[ ] COVID-19."  Docket Item 14 at 4-7 ("Goldenson Decl. II").  The remaining petitioners allege that they are at a "higher risk" because of their age or other serious medical conditions.  Docket Item 1 at 2.  Dr. Goldenson classifies these petitioners as being "at increased risk of developing serious complications or dying if [they] contract[ ] COVID-19."  Docket Item 14 at 3, 5 (Goldenson Decl. II).

Medical professionals, including professionals employed by the United States government, are advising individuals vulnerable to serious complications from COVID-19 to self-isolate in order to reduce their risk of exposure—a measure the petitioners allege is not possible in the congregate settings in which they currently are housed at BFDF.  *See* Section (I)(B), *infra*.  The petitioners have not pointed to any confirmed cases at BFDF but highlight that there are at least two confirmed cases at the Wende Correctional Facility, through which all persons transferring from a New York State prison into ICE custody at BFDF are processed.  Docket Item 1 at 4.

## **LEGAL STANDARD**

"A preliminary injunction is an equitable remedy and an act of discretion by the court." *Am. Civil Liberties Union v. Clapper*, 804 F.3d 617, 622 (2d Cir. 2015). The same standard governs consideration of an application for a TRO. *Andino v. Fischer*, 555 F. Supp. 2d 418, 419 (S.D.N.Y. 2008). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Trump v. Deutsche Bank AG*, 943 F.3d 627, 640 (2d Cir.), *cert. granted*, 140 S. Ct. 660 (2019) (quoting *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008)).[3] Moreover, the Second Circuit has instructed that a mandatory injunction—that is, an injunction commanding a positive act, as opposed to one that merely maintains the status quo— "should issue 'only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief.'" *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 34 (2d Cir. 1995) (quoting *Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025 (2d Cir. 1985)).

---

[3] Although the Second Circuit also recognizes a "less rigorous standard" of "sufficiently serious questions going to the merits to make them a fair ground for litigation plus a balance of hardships tipping decidedly in their favor," that standard "cannot be used"—as the petitioners here seek to do—"to preliminarily enjoin governmental action." *Deutsche Bank*, 943 F.3d at 637 (citations omitted); *see also Able v. United States*, 44 F.3d 128, 131 (2d Cir. 1995) ("As long as the action to be enjoined is taken pursuant to a statutory or regulatory scheme, even government action with respect to one litigant requires application of the 'likelihood of success' standard.").

## **DISCUSSION**

### I.    **LIKELIHOOD OF SUCCESS**

The petitioners allege that their continued detention during the COVID-19 pandemic violates their substantive rights under the Due Process Clause of the Fifth Amendment to the United States Constitution.  *See* Docket Item 1.  The Due Process Clause prohibits the federal government from depriving any "person . . . of . . . liberty without due process of law."  U.S. Const. amend. V.  "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that Clause protects."  *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). The protection applies to "all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent."  *Id.* at 693.

"[G]overnment detention violates the Due Process Clause unless the detention is ordered in a *criminal* proceeding with adequate procedural protections, or, in certain special and narrow nonpunitive circumstances, where a special justification, such as harm-threatening mental illness, outweighs the individual's constitutionally protected interest in avoiding physical restraint."  *Id.* (citations omitted) (alteration in original); *see also United States v. Haymond*, 139 S. Ct. 2369, 2373 (2019) (explaining that, other than those unique, special, and narrow circumstances, "[o]nly a jury, acting on proof beyond a reasonable doubt, may take a person's liberty"—a "promise [that] stands as one of the Constitution's most vital protections against arbitrary government"); *United States v. Salerno*, 481 U.S. 739, 755 (1987) ("In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception.").

### A.      Substantive Due Process Violation: Deliberate Indifference

The petitioners' claim is best understood as an amalgam of two theories of substantive Due Process violations: unconstitutional conditions of confinement and deliberate indifference to serious medical needs.[4]  Both theories derive from the same principle:

> [W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well being. . . . The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—*e.g.*, food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment . . . .

*Helling v. McKinney*, 509 U.S. 25, 32 (1993) (alterations in original) (quoting *DeShaney v. Winnebago Cty. Dept. of Soc. Svcs.,* 489 U.S. 189, 199-200 (1989)).  This rationale applies here because a detainee's rights are "at least as great as the Eighth Amendment protections available to a convicted prisoner."  *See City of Revere*, 463 U.S. 239, 244 (1983).

To evaluate the merits of either a conditions-of-confinement or a denial-of-medical-care claim, courts consider whether the complained-of conditions or deprivation "amount to punishment."  *Bell v. Wolfish*, 441 U.S. 520, 535 (1979).[5]  That is so

---

[4] *Cf. LaBounty v. Coughlin*, 137 F.3d 68, 74 (2d Cir. 1998) ("[The plaintiff] claims that his continuous health problems caused by exposure to friable asbestos in the air went unattended at [the prison] as [the] defendants failed to rid the premises of the asbestos or take measures to insulate [the plaintiff] from the asbestos particles.  [The plaintiff's] request to be kept in an asbestos-free environment constituted a serious medical need.").

[5] *See also Charles v. Orange Cty.*, 925 F.3d 73, 86 (2d Cir. 2019) (explaining that because "'deliberately indifferent conduct' is 'egregious enough to state a substantive due process claim,'" a court "need not . . . conduct a separate analysis, over

because "a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law."  *Id.* at 535; *see also Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017) ("A pretrial detainee's claims are evaluated under the Due Process Clause because[ ] pretrial detainees have not been convicted of a crime and thus may not be punished in any manner—neither cruelly and unusually nor otherwise." (citations omitted)).

A complained-of condition or deprivation amounts to punishment if: (a) "the disability is imposed for the purpose of punishment"—that is, there is "an expressed intent to punish on the part of detention facility officials"; (b) no "alternative purpose to which [the condition or deprivation] may rationally be connected is assignable for it"; or (c) the condition or deprivation is "excessive in relation to the alternative purpose assigned [to it]."  *See Bell*, 441 U.S. at 538 (third and fourth quoting *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-169 (1963)).

The petitioners here do not advance the first theory.  Nor do they advance the second, and wisely so.  There is no dispute that an individual's unlawful presence in this country is a "special justification" that in many circumstances outweighs the individual's interest in avoiding restraint.  *See Zadvydas*, 533 U.S. at 690 (recognizing the government's interests in detaining noncitizens to "ensur[e] the appearance of aliens at future immigration proceedings" and to "prevent[ ] danger to the community" (citations omitted)); *see also Demore v. Kim*, 538 U.S. 512, 528 (2003) ("[D]etention of deportable criminal aliens pending their removal proceedings . . . necessarily serves the purpose of

---

and above the deliberate indifference analysis, of whether the state's conduct 'shocks the conscience'" (quoting *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998))).

preventing deportable criminal aliens from fleeing prior to or during their removal proceedings, thus increasing the chance that, if ordered removed, the aliens will be successfully removed." (alterations omitted)).[6]

The central dispute is therefore whether the petitioners' detention at the BFDF under current conditions during the COVID-19 pandemic is "excessive" in relation to the government's legitimate interests in keeping them detained.

_____

[6] When analyzing the process due to noncitizens, there is a relevant "distinction between an alien who has effected an entry into the United States and one who has never entered." *Zadvydas*, 533 U.S. at 693; *see also Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212 (1953) (explaining that "an alien on the threshold of initial entry stands on a different footing" when it comes to Due Process rights). After all, if release from physical confinement means that noncitizens who have never "entered" our country will "be released into American society," *Chi Thon Ngo. v. I.N.S.*, 192 F.3d 390, 394 (3d Cir. 1999) (quoting *Barrera-Eschavarria*, 44 F.3d 1441, 1448 (9th Cir. 1995)), release may "ultimately result in our losing control over our borders," *id.* (quoting *Jean v. Nelson*, 727 F.2d 957, 975 (11th Cir. 1984)). Therefore, the nature of protection under the Due Process Clause "may vary depending upon [a noncitizen's] status and circumstance." *Zadvydas*, 533 U.S. at 694. Although it appears that petitioner Patrick Maduabuchi Nwankwo was never admitted to the United States, *see* Docket Item 26, this Court does not find that his interests as an excludable alien are materially lower than those of removable aliens *for purposes of this analysis* and, more importantly, *for purposes of the injunctive relief ordered today*. Both the excludable- and removable-alien petitioners claim that the government is forcing them to live in conditions that fall below acceptable societal standards of decency. By holding Nwankwo in detention, the respondents have assumed a burden they cannot ignore—his status as an excludable alien notwithstanding.

This Court also notes that, in light of the injunctive relief it orders today, it need not consider the penological ramifications of releasing the detainees. It nevertheless notes that the analysis in the criminal context would involve a decidedly more intense analysis of the individual's dangerousness to the community upon release. *Cf. Salerno*, 481 U.S. at 749, 50 ("The government's interest in preventing crime by arrestees is both legitimate and compelling . . . [and] heightened when the [g]overnment musters convincing proof that the arrestee, already indicted or held to answer for a serious crime, presents a demonstrable danger to the community." (citation omitted)). While it is true that many immigration detainees have criminal histories—including some of the petitioners in this matter—it also is true that all petitioners with criminal records have served their sentences and so any risk of danger to society is necessarily not as high as that posed by someone who has not yet completed his period of rehabilitation.

### 1.   Unsanitary Conditions of Confinement

A civil detainee may establish that he is subject to "excessive" and therefore unconstitutional conditions of confinement by showing that "officers acted with deliberate indifference to the challenged conditions."  *Darnell*, 849 F.3d at 29 (2d Cir. 2017) (citation omitted).  That showing requires the detainee to "satisfy two prongs": (1) an "objective prong showing that the challenged conditions were sufficiently serious to constitute objective deprivations of the right to due process," and (2) a "subjective" or "*mens rea* prong . . . showing that the officer acted with at least deliberate indifference to the challenged conditions"—that is, that the official "acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed . . . even though the [official] knew, or should have known, that the condition posed an excessive risk to health or safety."  *Id.* at 29, 35.

With respect to the first prong, "to establish an objective deprivation, the inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health, which includes the risk of serious damage to physical and mental soundness."  *Id.* at 30 (citations omitted).  "There is no static test to determine whether a deprivation is sufficiently serious; instead, the conditions themselves must be evaluated in light of contemporary standards of decency."  *Id.* (citations omitted).  For example, in the context of the Eighth Amendment, the Second Circuit has explained that "whether exposure to [a specific condition] is cruel and unusual depends on both the duration and the severity of the exposure."  *Willey v. Kirkpatrick*, 801 F.3d 51, 68 (2d Cir. 2015).  "The severity of an exposure may be less quantifiable than its duration, but its qualitative offense to a prisoner's dignity should be given due consideration."  *Id.*  "[A]ny analysis must consider both the duration and the

severity of an inmate's experience of being exposed to unsanitary conditions." *Id.* "[A]lthough the seriousness of the harms suffered . . . may shed light on the severity of an exposure, serious injury is unequivocally not a necessary element of an [unconstitutional conditions] claim." *Id.* (citations omitted).

In *Helling*, the Supreme Court held that a prisoner could state a cognizable claim under the Eighth Amendment where he alleged that officials had, "with deliberate indifference, exposed him to levels of [environmental tobacco smoke] that pose[d] an unreasonable risk of serious damage to his future health." 509 U.S. at 35. To succeed on the subjective prong, the plaintiff would need to show that "the prison authorities' current attitudes and conduct" evinced deliberate indifference. *Id.* at 36. To succeed on the objective prong, the Court explained, the plaintiff would need to show both that "he himself [was] being exposed to unreasonably high levels of [environmental tobacco smoke]" and that "society consider[ed] the risk that the prisoner complain[ed] of to be so grave that it violate[d] contempora[neous] standards of decency to expose *anyone* unwillingly to such a risk"—that is, the plaintiff would need to produce "more than a scientific and statistical inquiry into the seriousness of the potential harm and the likelihood [of] injury." *Id.* at 35, 36 (emphasis in original).

In so holding, the Court rejected the defendants' argument that the plaintiff's claim was not cognizable because he had not alleged any present harm, explaining: "We have great difficulty agreeing that prison authorities may not be deliberately indifferent to an inmate's current health problems but may ignore a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year." *Id.* at 33. The Court noted several other examples of

circumstances where inmates might obtain an "injunction" to remedy a "plainly . . .
unsafe, life-threatening condition in their prison" even though "nothing yet had
happened to them."  *Id.*  One such circumstance was "exposure of inmates to a serious,
communicable disease [even if the] inmate shows no serious current symptoms."  *Id.*  In
short, the Court found that "a remedy for unsafe conditions need not await a tragic
event."  *Id.*

### 2.  Serious Medical Needs

A civil detainee also may show that his detention "amounts to punishment" and
therefore violates the Due Process Clause by demonstrating that officials are acting with
deliberate indifference to his serious medical needs.  "That is true whether the
deliberate indifference is manifested by prison doctors in their response to the prisoner's
needs, or by prison guards who intentionally deny or delay access to medical care or
intentionally deny or delay access to the treatment once prescribed."  *Charles v. Orange
Cty.*, 925 F.3d 73, 85 (2d Cir. 2019).  A civil detainee may establish an unconstitutional
deprivation of medical care by showing "(1) that [he has] a serious medical need . . . ,
and (2) that the [d]efendants [have] acted with deliberate indifference to such needs."
*Id.* at 86 (citation omitted).

The "objective," serious-medical-needs prong "contemplates a condition of
urgency such as one that may produce death, degeneration, or extreme pain."  *Id.*
(citation omitted).  "In determining whether a medical need is sufficiently serious to be
cognizable as a basis for a constitutional claim for deprivation of medical care, [courts]
consider factors such as whether a reasonable doctor or patient would find the injury
important and worthy of treatment, whether the medical condition significantly affects an

individual's daily activities, and whether the illness or injury inflicts chronic and substantial pain." *Id.* (citation omitted).

The "*mens rea*," deliberate-indifference prong mirrors the standard discussed above in the context of a conditions-of-confinement claim. *See id.* at 86-87. "[A] detainee asserting a [Due Process] claim for deliberate indifference to his medical needs can allege either that the defendants *knew* that failing to provide the complained of medical treatment would pose a substantial risk to his health or that the defendants *should have known* that failing to provide the omitted medical treatment would pose a substantial risk to the detainee's health." *Id.* at 87 (emphasis in original). "Whether the state knew or should have known of the substantial risk of harm to the detainee is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Id.* (citations omitted). "A factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.* (quoting *Farmer*, 511 U.S. 825, 842 (1994)).

### B.   Application

#### 1.   Objective: Unsanitary Conditions and/or Serious Medical Needs

The petitioners make two separate (though related) arguments. The first is that the conditions at BFDF subject them to a heightened risk of contracting COVID-19. They argue that this heightened risk—together with the high death rates among those over a certain age or with underlying conditions like theirs who contract COVID-19, even if they receive treatment—amounts to an unreasonably high risk of serious injury or death. The second is that if they contract COVID-19, they will not receive adequate care at or through BFDF.

12

This Court is unpersuaded by the second argument.  The petitioners have not presented any evidence that BFDF could not provide them with adequate care, including by transporting them to local hospitals.  The point of reference must be what someone would receive were he or she not in state custody.  And the petitioners have not persuaded the Court that BFDF could not provide, or would deny them, such care. The respondents, on the other hand, have shown that they are providing detainees with 24/7 access to medical professionals, *see* Docket Item 42-4 at 2 (Declaration of Jeffrey Searls, administrator of BFDF ("Searls Decl.")), and have represented that if a detainee is infected, he or she would be kept in isolation and immediately hospitalized if necessary, *see* Docket 42-1 at 3 (Declaration of Captain Abelardo Montalvo, M.D. ("Montalvo Decl.")).

So the question is whether the petitioners' first argument has any teeth.  In other words, is the expected risk to the petitioners' health and safety from COVID-19 so high that the respondents cannot, as a constitutional matter, force the petitioners to live in conditions that pose a heightened risk of contracting the disease?  If so, does their current living situation heighten the risk of contraction?  In Due Process language: Does forcing high-risk detainees to live in a congregate setting during the COVID-19 pandemic pose a risk that "society considers . . . so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk"?  *See Helling*, 509 U.S. at 36 (emphasis in original).  If so, are the efforts the respondents have taken to ameliorate that risk of contraction sufficient?

This Court is trained in the law, not medicine.  The best it can do in this situation is turn to the experts.  And the guidance from experts, including many government

experts, is that the health risks posed by COVID-19 to individuals over a certain age or with certain underlying medical conditions are indeed grave.

a.    *Health and Safety Risks Posed by COVID-19*

First, COVID-19 poses a grave risk for those over 65 or with certain underlying health conditions.  According to one of the petitioners' medical experts, Robert B. Greifinger, M.D., "COVID-19 is a serious disease, ranging from no symptoms or mild ones for people at low risk, to respiratory failure and death in older patients and patients with chronic underlying conditions."  Docket Item 3 at 1-2 ("Greifinger Decl."); *see also* Docket Item 4 at 2 ("Goldenson Decl. I"); Docket Item 7 at 2 (declaration of Jonathan Louis Golob, M.D., Ph.D. ("Golob Decl.")).  There is no vaccine to prevent COVID-19, nor is there a known cure or anti-viral treatment at this time.  Docket Item 7 at 2 (Golob Decl.).  Dr. Anthony Fauci, director of the National Institute of Allergy and Infectious Diseases, estimated on March 31, 2020, that between 100,000 and 240,000 will die of COVID-19.  Michael D. Shear et al., *Coronavirus May Kill 100,000 to 240,000 in U.S. Despite Actions, Officials Say*, N.Y. Times, Mar. 31, 2020, https://www.nytimes.com/2020/03/31/us/politics/coronavirus-death-toll-united-states.html.

The CDC has concluded that "[p]eople aged 65 years and older" might be at higher risk for severe illness from COVID-19.  *See People who are at higher risk for severe illness*, Ctrs. for Disease Control and Prevention (March 31, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fspecific-groups%2Fhigh-risk-complications.html; *see also* Docket Item 3 at 1-2 (Greifinger Decl.) ("[T]he risk of serious disease and death among those with COVID-19

increases with age, with 78% of reported deaths occurring in people over the age of 65. More than 50% of COVID-19 related intensive care admissions and more 80% of COVID-19 deaths were among people 65 years old or older."); *cf.* Docket Item 4 at 2 (Goldenson Decl. I) ("Older individuals . . . are at greater risk of becoming seriously ill or dying from the illness.  (It is well-accepted within the medical community that, due to the burden of chronic illnesses and unhealthy lifestyle choices of many of many those housed in correctional facilities, incarcerated individuals over the age of 50 years old are considered to be elderly.)"); Docket Item 5 at 1 (Declaration of Marc F. Stern, M.D. ("Stern Decl.")) ("Vulnerable people include people over the age of 50."); Docket Item 7 at 1 (Golob Decl.) ("People over the age of fifty are at higher risk, with those over 70 at serious risk.").

The CDC also has advised  that "[o]ther high-risk conditions could include: [p]eople with chronic lung disease or moderate to severe asthma[; p]eople who have serious heart conditions[; p]eople who are immunocompromised . . . [; p]eople of any age with severe obesity (body mass index [BMI] of 40 or higher)[; p]eople with diabetes[; p]eople with chronic kidney disease undergoing dialysis[; or p]eople with liver disease." *See People who are at higher risk for severe illness*, *supra*; *see also* Docket Item 4 at 2 (Goldenson Decl. I) ("[T]hose with serious chronic medical conditions, such as heart disease, diabetes and lung disease, are at greater risk of becoming seriously ill or dying from the illness."); Docket Item 5 at 1 (Stern Decl.) ("The effects of COVID-19 are very serious, especially for people who are most vulnerable[,] . . . includ[ing] people . . . of any age with underlying health problems such as—but not limited to—weakened

immune systems, hypertension, diabetes, blood, lung, kidney, heart, and liver disease, and possibly pregnancy.").

The CDC recently released an analysis of 7,162 cases of COVID-19 in the United States for which data on the patient's underlying health was available.  CDC COVID-19 Response Team, *Preliminary Estimates of the Prevalence of Selected Underlying Health Conditions Among Patients with Coronavirus Disease 2019—United States, February 12–March 28, 2020*, Morbidity and Mortality Weekly Report, at 1-2 (Mar. 31, 2020), http://dx.doi.org/10.15585/mmwr.mm6913e2.  78% of those admitted to the intensive care unit had at least one pre-existing condition, including diabetes, lung disease, cardiovascular disease, renal disease, or an otherwise compromised immune system.  *Id.*

This Court therefore "takes judicial notice that, for people of advanced age, with underlying health problems, or both, COVID-19 causes severe medical conditions and has increased lethality."  *Basank v. Decker*, 2020 WL 1481503, at *3 (S.D.N.Y. Mar. 26, 2020) (citing Fed. R. Evid. 201(b)) (additional citations omitted).  Numerous Courts, including several in this circuit, have reached similar conclusions.  *See Coronel v. Decker*, 2020 WL 1487274, at *4 (S.D.N.Y. Mar. 27, 2020); *Hernandez v. Decker*, 2020 WL 1547459, at *3 (S.D.N.Y. Mar. 31, 2020); *Basank*, 2020 WL 1481503, at *5.

> b.   *Risk of COVID-19 Infection in a Congregate Setting*

The petitioners also have shown that they face a heightened risk of contracting COVID-19.  At oral argument, the respondents confirmed that the petitioners are currently being housed within the general population at the BFDF.  They eat communally, use shared restrooms, and are housed in either shared cells or in dorm-

style housing.[7]  Government experts and the petitioners' experts agree that such a

communal-living style congregate setting increases the infection rate.

For example, the CDC advises:

People in correctional and detention facilities are at greater risk for some illnesses, such as COVID-19, because of close living arrangements with other people.  The virus is thought to spread mainly from person-to-person, through respiratory droplets produced when an infected person coughs or sneezes.  These droplets can land in the mouths or noses of people who are nearby or be launched into the air and inhaled into someone's lungs.  It is possible that a person can get COVID-19 by touching a surface or object that has the virus on it and then touching their own mouth, nose, or eyes; however, this is not the most likely way the virus spreads.

See FAQs for administrators, staff, people who are incarcerated, families, Ctrs. for

Disease Control and Prevention (Mar. 28, 2020), https://www.cdc.gov/coronavirus/2019-

ncov/community/correction-detention/faq.html.  The United States Attorney General

largely concurs.  See, e.g., Docket Item 15 at 4 (United States Attorney General,

Memorandum to the Director of the Federal Bureau of Prisons: Prioritization of Home

Confinement as Appropriate in Response to COVID-19 Pandemic (March 26, 2020)) ("I

am hereby directing you to prioritize the use of your various statutory authorities to grant

home confinement for inmates seeking transfer in connection with the ongoing COVID-

19 pandemic.  Many inmates will be safer in BOP facilities where the population is

controlled and there is ready access to doctors and medical care.  But for some eligible

inmates, home confinement might be more effective in protecting their health.").

For their part, the petitioners' experts assert strongly that congregate settings like

those at BFDF heighten the risk of contracting COVID-19.  "The conditions of

---

[7] The government could not confirm, however, how many individuals are in each room in the dormitories.

congregate settings, such as jails and immigration detention facilities, pose a heightened public health risk to the spread of COVID-19, even greater than other non-carceral institutions."  Docket Item 3 at 3 (Greifinger Decl.).  The experts point to a host of reasons for this heightened risk of contraction, including crowding, the proportion of vulnerable people detained, the lack of ventilation, and often scant medical-care resources.  Docket Item 3 at 4-5 (Greifinger Decl.); Docket Item 5 at 2 (Stern Decl.).  They point in particular to the fact that detainees cannot practice the "social distancing" measures needed to contain the spread because detainees share toilets, sinks, and showers; sleep in communal dorms or barracks-style rooms and eat communally; and eat food prepared and served communally as well.  Docket Item 3 at 5 (Greifinger Decl.); Docket Item 5 at 2 (Stern Decl.).  They also highlight that daily staff rotations increase the risk of infection.  Docket Item 3 at 5 (Greifinger Decl.); Docket Item 5 at 2 (Stern Decl.); *see also* Docket Item 5 at 2 (Stern Decl.) ("To the extent that detainees are housed in close quarters, unable to maintain a six-foot distance from others, and sharing or touching objects used by others, infectious diseases that are transmitted via the air or touch are more likely to spread, placing people at risk. . . . For these reasons, if—but more likely when—COVID-19 is introduced into the facility, the risks of spread is greatly, if not exponentially, increased as already evidenced by spread of COVID-19 in two other congregate environments: nursing homes and cruise ships.").

What is more, the findings regarding the risk of contracting COVID-19 in a communal setting are true even though there presently are no reported cases at BFDF.

Docket Item 42-1 at 4.[8]  Community spread is nationwide at this point, and there are

reported cases in all eight of Western New York's counties.  *See Live: Coronavirus*

*Cases in Western New York*, Rochester Regional Health (Apr. 1, 2020),

https://www.rochesterregional.org/news/2020/02/coronavirus-in-new-york.  Moreover,

there are least two confirmed cases at the Wende Correctional Facility, through which

all persons transferring from a New York State prison into ICE custody at BFDF are

─────────────────

[8] The government argues that the petitioners have not met their burden in this case because they have not shown that they would be at lower risk in many of the locations to which they would travel if released.  Indeed, the government asserts that most of the petitioners would be no safer outside BFDF than inside because they plan to travel to areas of the country with significant outbreaks of COVID-19.  *See* Docket Item 42-5 at 2, 16-17.  A majority of the petitioners represent that, if released, they would reside with friends or family in the New York metropolitan area.  *See* Docket Items 16, 28.

In light of the injunctive relief ordered today, the Court need not address this argument in depth.  It notes, however, that the government misconstrues the nature of the legal claims at issue here.  The Fifth Amendment right to confinement in conditions that do not pose an unreasonable risk to health and safety derives from the fact that "when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well being. . . . [because] it [has] render[ed] him unable to care for himself."  *Helling*, 509 U.S. at 32 (alterations in original) (quoting *DeShaney,* 489 U.S. at 199-200).  So a condition can be unconstitutional only when an individual forcibly is held in state custody.  The violation *necessarily* ends when the individual no longer is in state custody.  At that point, the state no longer owes him a duty of reasonable care.  *See DeShaney*, 489 U.S. at 199-200.

What is more, the respondents' argument does not, as a factual matter, address the petitioners' claim.  Even if it is true that the petitioners would face greater hurdles to accessing *treatment and care* in New York, that does not carry the day.  As this Court already has found, the petitioners are not being denied access to care.  The relevant factual question is whether the petitioners are at an unconstitutionally greater risk of *contracting* the disease at BFDF than if they were not detained.  And on that question, the respondents have not presented any data to that effect.  If the petitioners follow the "social distancing" measures put in place by the Governor—and the Court has no reason to believe they would not, given their risk factors—there is no reason to believe they would be at greater risk of *contraction* in New York than at BFDF.

processed.  Docket Item 1 at 4.  And the petitioners' expert has concluded that "it is highly likely, and perhaps inevitable, that COVID-19 will reach the immigration detention facilities in New York."  Docket Item 3 at 3 (Greifinger Decl.).  "[A] remedy for unsafe conditions need not await a tragic event."  *Helling*, 509 U.S. at 33; *see also Coronel*, 2020 WL 1487274, at *1 (granting four immigration detainees' motion for a TRO and ordering their immediate release where they "represented . . . that there [had] been confirmed cases at two of the three facilities where [they were] detained").  What then of the respondents' efforts to ameliorate the heightened risk of contracting this dangerous disease?

### 2.   "Mens Rea": Deliberate Indifference

As an initial matter, there is no dispute that the respondents have actual knowledge of the petitioners' serious needs.  On March 22, 2020, and again on March 25, 2020, the petitioners notified the government about the particular circumstances of their cases and their high risk of harm.  *See* Docket Item 9 at 10 (Petitioners' Memorandum of Law).  The question is what the respondents have done with the knowledge.

The respondents have taken substantial steps toward protecting the health and safety of the individuals detained at BFDF.  Captain Abelardo Montalvo, M.D., the Eastern Regional Clinical Director with ICE Health Services Corps, reviewed the measures currently being taken at BFDF to protect the detainees' health and safety.  He attests to the following facts.  Docket Item 42-1 (Montalvo Decl.).

Since March 12, 2020, incoming detainees at BFDF are "checked with a thermometer for fever."  Docket Item 42-1 at 3.  They also are "asked to confirm if they

have had close contact with a person with laboratory-confirmed COVID-19 in the past

14 days, and whether they have traveled from or through areas with sustained

community transition in the past two weeks."  *Id.* at 2-3.  "Detainees who present

symptoms compatible with COVID-19 will be placed in isolation, where they will be

tested.  If testing is positive, they will remain isolated and treated.  In case of any clinical

deterioration, they will be placed in the BFDF medical bay or referred to a local

hospital."  *Id.* at 3.  Detainees with known exposure to a person with confirmed COVID-

19 but who are asymptomatic "are placed in a quarantine with restricted movement for"

up to 14 days and "monitored daily for fever and symptoms of respiratory illness."  *Id.*

Quarantine "involves housing [exposed but asymptomatic] detainees together."  *Id.*  And

new detainees arriving at the facility "will be placed in quarantined dorms and separated

from the general population for 14 days until cleared.  If new persons are added, or

someone becomes ill, then the 14-day quarantine restarts."  *Id.* at 4.[9]

　　　　BFDF also "has increased sanitation frequency and thoroughness."  *Id.* at 4.  The

facility uses paid "detainee workers to reduce the contact rate between ICE staff and

detainees and . . . limit any exposure between populations."  *Id.* at 4.  Personal visits

have been temporarily suspended—though counsel is able to visit in "no-contact"

rooms—and BFDF has been providing and continues to provide education to detainees

---

[9] At oral argument, the respondents stated that *all* new arrivals are isolated from the general population upon arrival.  The respondents' declarations leave some question as to whether this policy indeed applies to all new arrivals or only to those who confirm contact with an infected individual, *see* Docket Item 42-1 at 3 (Montalvo Decl.), those arriving from a hospital, *see id.* at 4, and those arriving from other detention facilities, *see* Docket Item 42-4 at 4 (Searls Decl.).  The Court assumes the veracity of the respondents' counsel's representation at argument but expects confirmation of that fact in the isolation plan it orders today.

regarding best practices to prevent the spread of COVID-19.  *Id.* at 4-5.  Additionally, "[g]atherings of detainees have been cancelled or are being completed in dorms and their respective outdoor areas."  *Id.* at 5.

These measures are commendable and likely have prevented some measure of spread and mitigated some of the risks facing the respondents.  But the fact is that none of the steps discussed by Capt. Montalvo includes the "social distancing" measures recommended—especially for high-risk individuals—by the CDC, the New York State Department of Health, and the petitioners' experts, to name a few.

The CDC has recommended that people who are at higher risk should "[s]tay home."  *See People who are at higher risk for severe illness*, *supra*.  The State of New York has said even more.  On March 20, 2020, the Governor issued an executive order with the following guidance for New Yorkers over 70 and with underlying health conditions: "[r]emain indoors; . . . go outside [only] for solitary exercise; [p]re-screen all visitors and aides by taking their temperature and seeing if person is exhibiting other flu-like symptoms; [d]o not visit households with multiple people; [w]ear a mask when in the company of others; [t]o the greatest extent possible, everyone in the presence of vulnerable people should wear a mask; [a]lways stay at least six feet away from individuals; and [d]o not take public transportation unless urgent and absolutely necessary."  *Governor Cuomo Signs the 'New York State on Pause' Executive Order*, New York State Office of Governor Andrew Cuomo (Mar. 20, 2020), https://www.governor.ny.gov/news/governor-cuomo-signs-new-york-state-pause-executive-order.

In fact, the Governor and state health officials have concluded that the risks posed by COVID-19 are so grave that it has taken a number of *unprecedented* steps affecting all New Yorkers, even those with no particular vulnerability to the disease.  On March 7, 2020, Governor Cuomo declared a state of emergency for all of New York State.  *See* N.Y. Exec. Order No. 202 (Mar. 7, 2020),

https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/EO_202.pdf.  And in stages beginning on March 16, 2020, the Governor ordered the closing of all schools and universities, as well as nearly all businesses and places of public accommodation, and he has prohibited non-essential gatherings of any size through at least April 15, 2020.[10]  Governor Cuomo is far from alone in ordering these drastic measures.  *See Coronavirus: Three out of four Americans under some form of lockdown*, BBC World News (Mar. 31, 2020), https://www.bbc.com/news/world-us-canada-52103066.  And the New York State Department of Health advises that "[w]hen in public[,] individuals *must* practice social distancing of at least six feet from others."  *Governor Cuomo Signs the 'New York State on Pause' Executive Order*, *supra* (emphasis added).

---

[10] *See* N.Y. Exec. Order No. 202.3 (Mar. 16, 2020), https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/EO_202.3.pdf; N.Y. Exec. Order No. 202.4 (Mar. 16, 2020), https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/EO%20202.4.pdf; N.Y. Exec. Order No. 202.5 (Mar. 18, 2020), https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/EO_202_5.pdf; N.Y. Exec. Order No. 202.8 (Mar. 20, 2020), https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/EO_202.8.pdf; N.Y. Exec. Order No. 202.11 (Mar. 27, 2020), https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/EO_202_11.pdf; N.Y. Exec. Order No. 202.12 (Mar. 30, 2020), https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/EO_202.13.pdf.

The petitioners' experts urge the importance of these same "social distancing"
measures.  "The only way to mitigate the rapid spread of COVID-19 is to use scrupulous
hand hygiene and social distancing, self-quarantine for individuals who may have been
exposed, and isolation at a home or care facility for those who have been infected."
Docket Item 3 at 2 (Greifinger Decl.); *see also* Docket Item 4 at 2 (Goldenson Decl. I);
Docket Item 5 at 1 (Stern Decl.) ("COVID-19 is a novel virus.  There is no vaccine for
COVID-19, and there is no cure for COVID-19.  No one has prior immunity.  The only
way to control the virus is to use preventive strategies, including social distancing.").

The respondents so far have not made it possible for individuals with the CDC-
identified vulnerabilities to take these steps.  It has not, for example, isolated higher risk
individuals from other detainees or from staff who rotate daily in and out of the facility.
Nor is it testing all incoming detainees or the staff that comes and goes.  That failure is
particularly concerning given that the CDC recently reported that as many as 25 percent
of people infected with COVID-19 may not show symptoms.  *See* Apoorva Mandavelli,
*Infected but Feeling Fine: The Unwitting Coronavirus Spreaders*, N.Y. Times (Mar. 31,
2020), https://www.nytimes.com/2020/03/31/health/coronavirus-asymptomatic-
transmission.html?action=click&module=Spotlight&pgtype=Homepage; *see also* Docket
Item 5 at 1 (Stern Decl.) ("It is believed that people can transmit the virus without being
symptomatic and, indeed, that a significant amount of transmission may be from people
who are infected but asymptomatic or pre-symptomatic.").  The petitioners also continue
to eat their meals in communal settings and share bathing facilities, indicating that
"social distancing" is not possible at this time.  And the respondents have not provided
the petitioners or other high-risk detainees with masks as recommended by the New

York State Department of Health. *Cf.* Docket Item 42-1 at 4 (Montalvo Decl.) (explaining that "[*d*]*etainee workers*" are provided goggles" and "gloves" (emphasis added)).

In light of the decisions of a number of executive branch officials at both the state and federal level, it seems clear that "social distancing" for those with heightened COVID-19 risks is the most effective form of preventing a serious threat to the health and safety of those persons. Moreover, the recommended measures for preventing the spread of COVID-19 are unprecedented. Indeed, this Court is not aware of any other disease that caused New York State—let alone most of the nation—to decide that the *only* reasonable course of action was to shutter the economy, shelter in place, and isolate at home for weeks on end.

In short, the government's recommendations to the public suggest that those with certain conditions should not assume the risk of social contact. Indeed, New York State has *prohibited* individuals from assuming that risk. A measure that the government has forcibly—under threat of civil penalties—*imposed* on all persons within its jurisdiction cannot, at the same time, be forcibly denied to some portion of that population. The result compelled by this finding is that the respondents are acting with deliberate indifference to the health and safety of those petitioners with the conditions identified by the CDC by holding them in a congregate, communal-living setting where "social distancing is an oxymoron." *See* Docket Item 9-1 at 5 (Letter from Scott Allen, M.D., F.A.C.P., and Josiah D. Rich, M.D., M.P.H., to the House Committees on Homeland Security and Oversight and Reform, Mar. 19, 2020) ("Allen Letter")); *see also Hernandez*, 2020 WL 1547459 at *3 (finding that measures such as "modification of the

intake process and increasing sanitation frequency . . . [were] 'patently insufficient' to protect *any* detainees from infection absent 'enforcement of requisite social distancing'" (alteration in original) (quoting *Basank*, 2020 WL 1481503, at *5)).

In other words, the respondents have actual knowledge of serious risks to the health and well-being of individuals with the vulnerabilities identified by the CDC and have not taken adequate steps to protect the petitioners who have such vulnerabilities against those risks. *See also Hernandez*, 2020 WL 1547459 at *2 (concluding that the civil-immigration-detainee petitioner was likely to succeed on his deliberate-indifference claim because the respondents had "not taken any action to address the particular risks that COVID-19 poses to high-risk individuals like [the p]etitioner"); *Coronel*, 2020 WL 1487274, at *6 (same); *Basank*, 2020 WL 1481503, at *5 (same). *But see Sacal-Micha v. Longoria*, 2020 WL 1518861 (S.D. Tex. Mar. 27. 2020); *Dawson v. Asher*, 2020 WL 1304557, at *3 (W.D. Wash. Mar. 19, 2020). Because the high-risk petitioners are held in the respondents' "custody . . . against [their] will" and therefore "unable to care for [themselves]," *see Helling*, 509 U.S. at 32 (citation omitted), the respondents' failure to take these steps is a violation of their substantive rights under the Due Process Clause.

### C.    Conclusion

This Court finds that those petitioners who have the COVID-19 vulnerabilities identified by the CDC have demonstrated a likelihood of succeeding on their claim that the respondents are acting with deliberate indifference to unreasonably unsafe conditions at BFDF and to those petitioners' serious medical needs. The Court acknowledges both that such a finding is extraordinary and that the respondents themselves have been impacted by the COVID-19 pandemic in a variety of ways that

have affected their ability to respond to the outbreak.  But the Court's goal is neither to assign blame nor to justify past efforts.  It is instead to ensure that the petitioners' constitutional rights—here, their right to liberty and possibly life—are protected.

## II.   IRREPARABLE HARM

"The showing of irreparable harm is '[p]erhaps the single most important prerequisite for the issuance of a" temporary restraining order.  *Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002) (quoting *Bell & Howell: Mamiya Co. v. Masel Supply Co.*, 719 F.2d 42, 45 (2d Cir. 1983)).  Under this prong, parties seeking a TRO "must show that, on the facts of their case" and in the absence of the requested injunction, they will suffer a harm that "cannot be remedied after a final adjudication, whether by damages or a permanent injunction."  *Salinger v. Colting*, 607 F.3d 68, 81-82 (2d Cir. 2010).  In addition, the harm must be "neither remote nor speculative, but actual and imminent."  *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 114 (2d Cir. 2005) (citation omitted).

The petitioners have established irreparable harm in two different ways.  First, "the *alleged* violation of a constitutional right . . . triggers a finding of irreparable harm."  *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996) (emphasis in original) (citation omitted).  As discussed above, the petitioners have adequately alleged that their substantive due process rights have been violated.  Accordingly, "no further showing of irreparable injury is necessary."  *Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir. 1984) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." (citations omitted)).

Second, irreparable harm exists where, as here, the moving individuals "face imminent risk to their health, safety, and lives." *Henrietta D. v. Giuliani*, 119 F. Supp. 2d 181, 214 (E.D.N.Y. 2000) (citation omitted), *aff'd sub nom. Henrietta D. v. Bloomberg*, 331 F.3d 261 (2d Cir. 2003). For all the reasons discussed above, those petitioners with the CDC-identified vulnerabilities face a grave, irreparable risk to their health and safety if they remain confined under current conditions at BFDF.

## III.    BALANCE OF EQUITIES AND PUBLIC INTEREST

Where the government is the opposing party, the final two factors in the temporary restraining order analysis—the balance of the equities and the public interest—merge. *Planned Parenthood of New York City, Inc. v. U.S. Dep't of Health & Human Servs.*, 337 F. Supp. 3d 308, 343 (S.D.N.Y. 2018).

The petitioners and the public *both* benefit from ensuring public health and safety. *See Grand River Enterprises Six Nations, Ltd. v. Pryor*, 425 F.3d 158, 169 (2d Cir. 2005) (referring to "public health" as a "significant public interest"). Moreover, under the circumstances here, the public interest in ensuring public health is also best served by the petitioners' being confined in conditions that do not pose a substantial risk of their contracting COVID-19. As one of their medical experts points out, a COVID-19 outbreak at a detention facility "could result in multiple detainees—five, ten or more— being sent to the local community hospital where there may only be six or eight ventilators over a very short period. As they fill up and overwhelm ventilator resources, those ventilators become unavailable for all the usual critical illnesses." Docket Item 9-1 at 5 (Allen Letter). And ventilators used to treat detainees cannot be used to treat others who contract the virus. *See* Docket Item 5 at 3 (Stern Decl.) ("Reducing the

spread and severity of infection in a federal immigration detention center slows, if not

reduces, the number of people who will become ill enough to require hospitalization

where they will be using scarce community resources (ER beds, general hospital beds,

ICU beds) which in turn reduces the health and economic burden to the local

community at large."); Docket Item 3 at 5 (Greifinger Decl.) ("Releasing individuals, and

prioritizing the most vulnerable, reduces the burden on local health care resources, as it

reduces the risk of transmission of the disease to a large number of people living in

close proximity for an extended period of time.  It also reduces the risk of transmission

to staff.").  "In the alternate scenario where detainees" are either confined in conditions

facilitating "social distancing" or are released, "the tinderbox scenario of a large cohort

of people getting sick all at once is less likely to occur, and the peak volume of patients

hitting the community hospital would level out."  Docket Item 9-1 at 5 (Allen Letter).

    The respondents argue that the Western New York community would be able to

serve the needs of the petitioners and that the public interest therefore tips in their favor.

In support of that claim, they have presented data on available health beds in the area

surrounding BFDF.  *See* Docket Item 42-3 at 6.  But they have not provided data on, for

example, the number of available ventilators.  Nor have they provided projections on the

rate of spread in the surrounding community or any expert testimony to the effect that

the community could sustain an outbreak at BFDF as community spread outside the

facility—including in other carceral facilities—also increases.  The Court therefore finds

that the public interest favors the petitioners.

## IV.    REMEDY

For the reasons stated above, the petitioners have met the criteria for a TRO. The next question is what remedy is appropriate under the circumstances.  The petitioners seek their immediate release under conditions of supervision and, ultimately, a writ of habeas corpus under 22 U.S.C. § 2241.

Section 2241(c)(3) provides: "The writ of habeas corpus shall not extend to a prisoner unless . . . [h]e is in custody in violation of the Constitution or laws or treaties of the United States."  Courts are divided on whether section 2241 provides a vehicle for challenging (and a remedy for addressing) allegedly unconstitutional conditions of confinement.[11]

This Court need not resolve these difficult questions at this junction because the Second Circuit "has long interpreted [section] 2241 as applying to challenges to. . .

---

[11] *Compare Thompson v. Choinski*, 525 F.3d 205, 209 (2d Cir. 2008) ("This court has long interpreted [section] 2241 as applying to challenges to the execution of a federal sentence [and seeking injunctive relief], "including such matters as the administration of parole, . . . prison disciplinary actions, prison transfers, type of detention and prison conditions." (citations omitted)), *with Spencer v. Haynes*, 774 F.3d 467, 469 (8th Cir. 2014) (drawing a bright line between claims that challenge the "validity" or "length" of a conviction, which may be brought under section 2241, and those that challenge "the conditions of confinement," which may not) and *Glaus v. Anderson*, 408 F.3d 382, 388 (7th Cir. 2005) (distinguishing between a section 2241 petitioner who requests a "quantum change in the level of custody, which must be addressed by habeas corpus," and a petitioner who requests "a different program or location or environment, which raises a civil rights claim" and holding that "[i]f an inmate establishe[s] that his medical treatment amounts to cruel and unusual punishment, the appropriate remedy would be to call for proper treatment, or to award him damages; release from custody is not an option." (citation omitted)) and *Gomez v. United States*, 899 F.2d 1124 (11th Cir. 1990) (same)) and *Crawford v. Bell*, 599 F.2d 890, 891 (9th Cir. 1979) (same)) and *Cook v. Hanberry*, 596 F.2d 658, 660 (5th Cir. 1979) (same)). *Cf. Bell*, 441 U.S. at 526 n.6 (1979) ("[L]eav[ing] to another day the question of the propriety of using a writ of habeas corpus to obtain review of the conditions of confinement, as distinct from the fact or length of the confinement itself." (citation omitted)).

prison conditions," *Thompson v. Choinski*, 525 F.3d 205, 209 (2d Cir. 2008) (citation

omitted)—at least to the extent the petitioners seek a remedy short of release—and this

Court is not convinced that the unconstitutional conditions at BFDF cannot be remedied

through an injunction.

That is so because BFDF currently is at roughly half of its capacity to house

detainees.  Docket Item 42-1 at 4.  So it remains plausible that the respondents could

rectify the ongoing violation by providing those petitioners who meet the CDC's

definition of vulnerable individuals with a living situation that facilitates "social

distancing."[12]  The respondents might, for example, house those individuals in individual

cells or units with a limited number of individuals akin to a family unit outside the facility;

eat their meals, bathe, and shower in isolation or only among those in their smaller unit;

have extremely limited contact with both other detainees and staff, all of whom are

screened for fevers; and are provided masks to wear when contact is necessary.  The

Court leaves the task of identifying which petitioners satisfy the CDC criteria, and how to

facilitate their "social distancing," to the respondents' medical staff—at least in the first

instance.[13]

---

[12]  Governor Cuomo, in concert with the New York State Department of Health, advises the following actions: "[r]emain indoors; . . . go outside [only] for solitary exercise; [p]re-screen all visitors and aides by taking their temperature and seeing if person is exhibiting other flu-like symptoms; [d]o not visit households with multiple people; [w]ear a mask when in the company of others; [t]o the greatest extent possible, everyone in the presence of vulnerable people should wear a mask; [a]lways stay at least six feet away from individuals; and [d]o not take public transportation unless urgent and absolutely necessary."  *Governor Cuomo Signs the 'New York State on Pause' Executive Order*, *supra.*

[13] As discussed above, the CDC explains that "[o]ther high-risk conditions could include: [p]eople with chronic lung disease or moderate to severe asthma[; p]eople who have serious heart conditions[; p]eople who are immunocompromised . . . [; p]eople of any age with severe obesity (body mass index [BMI] of 40 or higher)[; p]eople with

## ORDER

**The respondents shall report to the Court no later than 5:00 p.m. on April 3, 2020**, with a detailed plan explaining how they will identify which petitioners meet the CDC's high-risk criteria and how they will facilitate those individuals' taking any or all of the "social distancing" measures recommended by the CDC and New York State Department of Health.  No later than **9:00 a.m. on April 6, 2020, the respondents shall report to the Court** as to whether any or all of the steps outlined in the plan have been taken and, if so, which ones.  They also shall identify for which petitioners the measures have been taken and provide a brief explanation why any petitioner does not meet the CDC's high-risk criteria.  The Court then will decide whether the constitutional violation has been remedied and whether further action of the Court is required.

IT IS SO ORDERED.

Dated:   April 2, 2020

Buffalo, New York

*/s/ Lawrence J. Vilardo*

LAWRENCE J. VILARDO
UNITED STATES DISTRICT JUDGE

diabetes[; p]eople with chronic kidney disease undergoing dialysis[; or p]eople with liver disease."  *See People who are at higher risk for severe illness*, *supra*.