UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

MARCKINDAL JULES,

           Petitioner,

    v.                                        20-CV-361-LJV
                                                DECISION & ORDER

ALEJANDRO MAYORKAS, *et al.*,

           Respondents.
_____


On March 25, 2020, a group of twenty-three civil immigration detainees held at the Buffalo Federal Detention Facility ("BFDF") in Batavia, New York, filed an emergency petition for a writ of habeas corpus under 28 U.S.C. § 2241.  Docket Item 1. They alleged that their continued detention in Immigration and Customs Enforcement ("ICE") custody during the early throes of the COVID-19 pandemic violated their substantive rights under the Due Process Clause.  *See id.*  On April 2, 2020, this Court granted in part the petitioners' request for temporary relief, *see Jones v. Wolf*, 467 F. Supp. 3d 74 (W.D.N.Y. 2020), and on August 31, 2020, this Court entered a permanent injunction requiring various social distancing and protective measures at the BFDF, *see* Docket Item 135.

Since then, the development of vaccines and post-infection treatments has dramatically changed the COVID-19 landscape.  Moreover, ICE has instituted and updated a comprehensive guidance document aimed at mitigating the risk of COVID-19 at immigration detention facilities.  Citing those changes, the respondents moved to vacate the permanent injunction and dismiss this case.  *See* Docket Item 304.  On

December 19, 2022, the petitioner[1] opposed the motion to vacate, Docket Item 344, and the respondents replied about a week later, Docket Item 346.

For the reasons that follow, the respondents' motion to vacate the permanent injunction is granted and the case is dismissed.

## FACTUAL BACKGROUND

On March 25, 2020, Jules and twenty-two other detainees held in ICE custody at the BFDF commenced this action. Docket Item 1. Each petitioner was "either over the age of fifty and/or [had] a serious underlying medical condition"; each alleged that he or she therefore was "more vulnerable to complications arising from COVID-19." *Id.* at 4. They claimed that the conditions of their civil detention during the COVID-19 pandemic violated their substantive due process rights, and they sought their immediate release from ICE custody. *See id.* at 23-25.

About a week later, this Court granted in part the petitioners' motion for a temporary restraining order. *See Jones*, 467 F. Supp. 3d at 80. More specifically, this Court found that holding vulnerable individuals, as defined by the Centers for Disease Control and Prevention ("CDC"), in the then-current conditions at the BFDF violated their substantive due process rights. *See id.* This Court therefore ordered the respondents to provide those petitioners who met the CDC's vulnerability criteria with a living situation that facilitated "social distancing." *Id.* at 95-96.

---

[1] Of the twenty-three civil immigration detainees who originally were petitioners in this case, only one, Marckindal Jules, remains in ICE custody.

On April 9, 2020, this Court found that the respondents' proposed social distancing measures largely were sufficient to remedy the previously identified constitutional violation. *See Ramsundar v. Wolf*, 2020 WL 1809677, at *4-6 (W.D.N.Y. Apr. 9, 2020). A few weeks later, this Court converted the temporary restraining order into a preliminary injunction. *See Ramsundar v. Wolf*, 2020 WL 1986923, at *3-5 (W.D.N.Y. Apr 27, 2020). And on August 31, 2020, this Court modified the terms of the preliminary injunction and converted it into a permanent injunction. *See* Docket Item 135.

In that order, this Court "enjoined [the respondents] from denying [vulnerable petitioners] any of the following 'social distancing' and other protective measures": (1) placement in single-occupancy cells; (2) accommodations to eat meals in those cells and to bathe and shower in isolation; and (3) free shower disinfectant, masks, and soap. *Id.* at 14-15. This Court further ordered "that all BFDF staff and officers shall wear masks whenever interacting with the[] vulnerable petitioners." *Id.* at 15. Finally, this Court ordered the respondents to post signs throughout the BFDF advising detainees of relevant information about COVID-19.[2]  *See id.*

When it entered the permanent injunction, this Court also considered the "appropriate length of time to enjoin the respondents' actions." *Id.* at 11. At that time, the petitioners asked this Court to "maintain the injunction as long as the COVID-19 crisis remains a danger to [them]." *Id.* at 12 (citation and internal quotation marks

---

[2] This Court also required the respondents to provide periodic updates about the conditions of confinement for vulnerable petitioners as well as the number of positive and negative COVID-19 tests for detainees and BFDF staff. *See* Docket Item 135 at 15. The parties stipulated to lift that requirement in April 2021. *See* Docket Items 204, 206.

omitted).  This Court declined to adopt that standard and instead tied the duration of the remedy in this case to the due process violation—namely, the respondents' failure to afford vulnerable detainees the same protections that were required for individuals living outside the BFDF.  *See id.*  As a result, this Court concluded that the injunction would remain in place until the New York Governor "determine[d] that individuals safely may congregate closer than six feet from each other[] without wearing a mask."  *Id.* at 13.

On February 22, 2021, the petitioners moved to modify the permanent injunction to require the respondents to (1) offer COVID-19 vaccines to the petitioners and (2) regularly test BFDF staff for COVID-19.  Docket Item 156.  After extensive filings, *see* Docket Items 167-68, 172, 174-78, 180-81, 184, 186-87, 189, 192-94, 199, a series of oral arguments and status conferences, *see* Docket Items 162, 173, 183, 191, 196, 198, 200, and a number of directives from the Court, *see* Docket Items 161, 171, 182, 190, 197, all consenting vulnerable detainees who were eligible for vaccines were offered vaccines, *see* Docket Item 202.  The parties then agreed to vacate prior vaccine-related orders.  *See* Docket Items 220, 222.  And on March 8, 2022, this Court denied the petitioner's remaining request: for regular COVID-19 testing of BFDF staff.  Docket Item 292.

About five months later, the respondents moved to vacate the permanent injunction.  Docket Item 304.  First, the respondents argued that the permanent injunction should be vacated under its own terms because the New York Governor had lifted social distancing and masking requirements.  *See* Docket Item 304-3 at 14-16; *see generally Audio, Video, Photos & Rush Transcript: Governor Hochul Holds a COVID-19 Briefing*, N.Y. State (Feb. 9, 2022), https://www.governor.ny.gov/news/audio-video-

photos-rush-transcript-governor-hochul-holds-covid-19-briefing.  The respondents also argued that ICE's Pandemic Response Requirements ("PRR"), as well as the development and availability of COVID-19 vaccines and post-infection treatments, were a material change in circumstances that warranted lifting the injunction.  *See id.* at 16-21.

On September 6, 2022, the petitioner requested discovery on conditions at the BFDF before responding to the motion to lift the permanent injunction.  Docket Item 311.  On November 17, 2022, this Court resolved that discovery request and ordered the respondents to provide information about the population density at the BFDF and the availability of vaccines and post-infection treatment.  *See* Docket Item 335.  The parties then fully briefed the motion to vacate, *see* Docket Items 344 and 346, and on February 6, 2023, this Court heard oral argument on that motion, *see* Docket Item 356.

## LEGAL PRINCIPLES

Federal Rule of Civil Procedure 60(b)(5) allows a party to seek relief from a final judgment when "applying it prospectively is no longer equitable."[3]  Fed. R. Civ. P. 60(b)(5).  "Rule 60(b)(5) may not be used to challenge the legal conclusions on which a prior judgment or order rests, but the Rule provides a means by which a party can ask a

---

[3] When this Court entered the permanent injunction, the Clerk of the Court did not enter judgment and close the case.  The respondents note that there is therefore some uncertainty about the precise rule that governs this motion.  *See* Docket Item 304-3 at 2 n.2.  Because "[a]n order granting a permanent injunction is a final order," *In re Taddeo*, 685 F.2d 24, 26 n.4 (2d Cir. 1982), this Court analyzes the respondents' motion under Rule 60(b)(5).  And regardless, it is "well established" that "a court has the authority to alter the prospective effect of an injunction in light of changes in . . . the circumstances."  *Benjamin v. Jacobson*, 172 F.3d 144, 161 (2d Cir. 1999).

court to modify or vacate a judgment or order if 'a significant change either in factual conditions or in law' renders continued enforcement 'detrimental to the public interest.'" *Horne v. Flores*, 557 U.S. 433, 447 (2009) (quoting *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 384 (1992)); *see also System Federation No. 91 v. Wright*, 364 U.S. 642, 647 (1961) ("[S]ound judicial discretion may call for the modification of the terms of an injunctive decree if the circumstances, whether of law or fact, obtaining at the time of its issuance have changed, or new ones have since arisen."). "The party seeking relief bears the burden of establishing that changed circumstances warrant relief, but once a party carries this burden, a court abuses its discretion 'when it refuses to modify an injunction or consent decree in light of such changes.'" *Horne*, 557 U.S. at 447 (citation omitted) (quoting *Agostini v. Felton*, 521 U.S. 203, 215 (1997)).

## DISCUSSION

When this Court first granted relief in this case, it ordered the respondents to provide what was then the "most effective" known precaution against COVID-19—a living situation that facilitated social distancing. *See Jones*, 467 F. Supp. 3d at 92. And because the due process violation here "stemmed from the government's failure to afford protections" to those detained at the BFDF "commensurate with those otherwise mandated by executive officials," *see* Docket Item 135 at 12-13, this Court incorporated requirements mandated generally for all people into its orders granting relief to BFDF detainees, *see Ramsundar*, 2020 WL 1986923, at *3-5; Docket Item 135 at 14-15. For similar reasons, this Court linked the duration of the permanent injunction to that due process violation. *See* Docket Item 135 at 12-13. That is, this Court ordered that the social distancing measures of the permanent injunction would remain in place until

6

social distancing ended in New York State—or when "the [New York] Governor determines that individuals safely may congregate closer than six feet from each other[] without wearing a mask." *Id.* at 13.

Subsequent developments have dramatically changed both the potential threat of COVID-19 at the BFDF and the broader public response to the pandemic. First, shortly after this Court ordered injunctive relief in this case, ICE released the first iteration of the PRR, a guidance document "designed to establish requirements, as well as best practices, for all detention facilities housing ICE detainees to follow during the COVID-19 pandemic." Docket Item 326 at 7-8; *see also ICE's Enforcement and Removal Operations COVID-19 Pandemic Response Requirements*, U.S. Immigr. & Customs Enf't, https://www.ice.gov/coronavirus/prr (last updated Nov. 1, 2022). That document, now in its tenth iteration, "is a dynamic document that [is] updated" based on consultation with the CDC and other "additional/revised information and best practices." Docket Item 326 at 6.

The PRR categorizes detention facilities each week by measuring the risk of COVID-19 transmission in both the facility itself and its surrounding community. *See id.* at 16-20. When a facility's transmission risk rises above the lowest level, staff and detainees must take additional precautions against COVID-19, including mandatory masking and social distancing measures. *See id.* So ICE now has formalized in the PRR many of the requirements that this Court had previously ordered, albeit with more flexibility based on a facility's particular circumstances.

In addition, the development and increased availability of COVID-19 vaccines and post-infection treatment has dramatically altered the risks posed by COVID-19 at

7

the BFDF.  As noted in the declaration of Tara Vijayan, M.D., "[v]accination, including booster shots, radically decrease[s] the likelihood of hospitalization and death due to COVID-19."  Docket Item 344-2 at ¶ 21.  By mid-April 2021, all vulnerable detainees who wanted a COVID-19 vaccine received one, *see* Docket Item 202, and a short time after that, all detainees at the BFDF—vulnerable or not—had been offered the COVID-19 vaccine, *see* Docket Item 212.

Since then, the BFDF has received shipments of the various COVID-19 vaccines from New York State, and "[d]etainees have been allowed to choose the vaccine received, subject to availability."  Docket Item 344-1 at 5-6.  According to the respondents, "[t]o date[] there have not been any vaccine supply issues at the BFDF regarding supply of any of the vaccine types from local/New York [State] authorities."  *Id.*  In other words, detainees not only can choose to be vaccinated, but they can choose which vaccine to get.

Moreover, the PRR requires all facilities to "follow the CDC's" guidance on post-infection treatment, which includes the use of "post-infection medications authorized for emergency use by the [Food and Drug Administration]."  Docket Item 344-1 at 7-8; Docket Item 326 at 25.  And according to the respondents, any "detainee[] requiring monoclonal antibodies or antiviral treatments ha[s] received" those treatments, and "there have been no issues with the supply of either monoclonal antibodies or antiviral medications for detainees who have been medically indicated to receive them."  Docket Item 344-1 at 7-8.  Finally, any detainee who "require[s] a higher level of care than can be safely provided at a detention facility must be transferred to community medical resources when needed, pursuant to the PRR."  *Id.* at 8.  So post-infection treatment is

8

available to detainees who require it, whether at the BFDF itself or at nearby medical facilities.

Taken together, those developments show that the BFDF—and society at large—is in a far different place than in March 2020.  In fact, as the respondents note, neither New York State nor the CDC list general social distancing as a primary protection against COVID-19, even in detention facilities.  *See* Docket Item 304-3 at 10-11.  That is, the developments outlined above have shifted the focus of the pandemic response away from social distancing and toward other prophylactic and therapeutic measures.  And because of those developments, the respondents argue that the permanent injunction in this case—which, by its own terms, was intended to last only as long as social distancing was required for the general public, *see* Docket Item 135 at 13—should be lifted.

The petitioner argues that those changed circumstances do not warrant lifting the injunction for two reasons.  First, the petitioner maintains that if the permanent injunction is lifted, the respondents "would be free and able to increase the number[] of detainees housed at the BFDF" from its current level of about half capacity.  *See* Docket Item 344 at 8-9.  And the petitioner argues that this Court should maintain its orders requiring social distancing and mandating all BFDF staff to wear masks when interacting with vulnerable detainees because COVID-19 continues to pose a threat to vulnerable detainees.  *See id.* at 9-11.

As an initial matter, the permanent injunction does not—and never did—mandate that the BFDF operate below any particular detainee population level.  *See generally* Docket Item 135.  Although this Court has considered the population density of the

BFDF in fashioning relief, *see, e.g.*, *Jones*, 467 F. Supp. 3d at 95, this Court did not include any limit or requirement in the permanent injunction. So this is not a case where lifting the injunction would "leave [the respondents] free to return to [their] old ways," *see* Docket Item 344 at 7, because the permanent injunction itself says nothing about what capacity level is required at the BFDF.

Moreover, in light of the developments stated above, maintaining the masking and social distancing requirements of the permanent injunction no longer is necessary or appropriate. The PRR already provides for a flexible masking requirement and requires staff to wear masks whenever the risk posed by COVID-19 rises above the lowest level. *See* Docket Item 326 at 16-20. At those higher risk levels, the facility first must consider and then must implement various social distancing measures, including housing detainees in individual rooms, reducing meetings of large groups, and maintaining social distancing. *See id.* at 16-20, 42. What is more, detainees are provided with hygienic supplies and personal protective equipment, including masks and N95 respirators, regardless of the facility's transmission level. *See id.* at 32-33. And all those social distancing and masking protections are in addition to the availability of vaccines and post-infection treatment at the BFDF or at local medical facilities. *See* Docket Item 344-1 at 5-8.

So the PRR ensures that facilities must adopt stringent social distancing and masking measures commensurate to the risk of COVID-19. And those measures supplement the broader prophylactic and treatment developments mentioned above. To ignore that dramatic change in circumstances and keep the permanent injunction in place—a permanent injunction that requires the BFDF to maintain certain precautions

that were necessary in the earliest stages of the COVID-19 pandemic—would not be an appropriate exercise of this Court's discretion.  *See Horne*, 557 U.S. at 447.  Because of the significant factual developments outlined above, this Court concludes that the due process rights of vulnerable detainees at BFDF are no longer at risk and that this Court's intervention is no longer needed.  *See id.*

For all those reasons, this Court agrees with the respondents that the significant change in circumstances discussed above warrants lifting the permanent injunction.  And at oral argument, the parties agreed that the case should be dismissed once the permanent injunction is lifted.  The motion to lift the permanent injunction therefore is granted and the case is dismissed.

## **CONCLUSION**

When the petitioners first filed this action, the threat posed by COVID-19 was immediate, uncertain, and unprecedented.  And the risks of COVID-19 were only exacerbated for vulnerable individuals who, like the petitioners in this case, were held in a congregate detention environment.  Faced with such "extraordinary times," this Court accordingly ordered "extraordinary remed[ies]."  *See Ramsundar*, 2020 WL 1809677, at *5.

Since then, however, the track record at the BFDF has been commendable. After some early disputes, *see, e.g.*, Docket Item 109, this Court has not needed to closely monitor the respondents' compliance with the orders in this case.  And shortly after vaccines against COVID-19 were developed and distributed, the parties quickly worked to ensure that all consenting detainees at the BFDF were vaccinated.  *See* Docket Item 212.  That record of success is due in no small part to the dedication and

professionalism of counsel for both the petitioners and the respondents throughout this case. This Court expresses its sincere appreciation for that work.

The need for this Court's intervention at the BFDF, however, has come to an end. Accordingly, for the reasons stated above, the respondents' motion to vacate the permanent injunction and dismiss the case, Docket Item 304, is GRANTED. The Clerk of the Court shall close the case.


SO ORDERED.

Dated:   March 10, 2023
         Buffalo, New York


       */s/ Lawrence J. Vilardo*
LAWRENCE J. VILARDO
UNITED STATES DISTRICT JUDGE